UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : CRIM. NO. 3:20-CR-165 |
| v. | : (JUDGE MARIANI) |
| | : |
| **LANCE GREEN** | : |
| | : |

## MEMORANDUM OPINION
### I. Introduction

Defendant Lance Green's Motion to Suppress Evidence (Doc. 17) is pending before the Court. With the Motion, Defendant asserts that the search warrant issued in this matter resulted from an illegal, extra-judicial traffic stop and, therefore, any information or evidence obtained as a result of the stop and/or the warrant should be suppressed. (Doc. 17 ¶ 13.)

Defendant is currently charged under the Indictment filed on July 14, 2020. (Doc. 1.) Count 1 charges a violation of 18 U.S.C. § 922(g), prohibited person in possession of a firearm; Count 2 charges a violation of 18 U.S.C. § 922(k), possession of a firearm with an obliterated serial number. The indictment is the third filed based on events which took place on or about October 5, 2017, including the traffic stop at issue in the pending Motion. The previous two cases filed as a result of the events of October 5, 2017, were dismissed without prejudice due to violations of the Speedy Trial Act.[1]

---

[1] 3:18-CR-21 was filed on January 23, 2018, and dismissed on July 19, 2019 (Docs. 1, 71, 72); 3:19-CR-233 was filed on July 30, 2019, and dismissed on July 9, 2020 (Docs.1, 50, 51). Both cases were

Upon consideration of the pending Motion, related documents, and evidence presented at the Suppression Hearing, the Court will deny Defendant's Motion to Suppress Evidence (Doc. 17).

## II. BACKGROUND

### A. Procedural Background

Defendant filed the Motion to Suppress on August 5, 2020, along with a supporting brief. (Docs. 17, 18.) The Government filed its brief in opposition on August 5, 2020. (Doc. 20.) The Court then scheduled a Suppression Hearing for October 27, 2020, which was continued to November 23, 2020, at the Government's request. (Docs. 21-23.) The Government presented two law enforcement witnesses at the Suppression Hearing, Robert Miller of the Kingston Municipal Police Department, and Daniel Roper of the Wilkes-Barre City Police Department. Defendant did not present any witnesses. At the close of the hearing, the parties requested the opportunity to file post-hearing briefs and they have now done so. (Docs. 40, 41.)

### B. Factual Background

On October 5, 2017, at approximately 10:00 a.m. two officers from the Kingston Municipal Police Department, Robert Miller and Sam Blaski, were dispatched to respond to a neighborhood dispute at 141-143 Second Avenue in Kingston, Pennsylvania, the

---

assigned to the Honorable A. Richard Caputo; the latter was reassigned to the undersigned on December 18, 2019.

addresses being the downstairs and upstairs units of one structure. (Hr'g Tr. (Doc. 34) 4:19-5:13.) They arrived at the scene separately and first interviewed the downstairs residents Noelle Peele, Andre Peele, and Sheila Rodriguez who reported an altercation with the upstairs resident, Nasheena Curry.[2] (Id. 5:7-11, 16-17, 7:1-3.) According to Miller's testimony and a redacted Police Incident Report, officers were told that Noelle Peele and Nasheena Curry had a physical altercation and Ms. Curry, during a phone call, had been heard by Ms. Peele and Ms. Rodriguez telling someone to "bring the strap," which is street terminology for a firearm. (Id. 7:1-12; Incident Rpt., Doc. 40-1 at 4.) Miller's Incident Report states that "[o]fficers advised both parties that they needed to stay away from each other and that I would be determining what charges were able to be pursued. Minor injuries were noted such as minor redness and minor scratches." (Doc. 40-1 at 4.) He confirmed at the Suppression Hearing that the injuries he observed following the first altercation were "extremely minor" as to both Nasheena Curry and Noelle Peele. (Doc. 34 at 16:25-17:7.)

Miller testified that, after interviewing the parties to the incident, "all we could prove is there was some sort of physical altercation that took place and the two of them were involved." (Id. 7:22-24.) He also stated that both parties wanted to file charges against each other but, "due to the way that Pennsylvania law works," the officers were not able to

---

[2] According to Police Statements completed by Sheila Rodriguez and Noelle Peele attached to Defendant's *pro se* correspondence with the Court docketed on December 16, 2020, Sheila Rodriquez is the mother of Noelle and Andre Peele. (Doc. 39 at 4-7.) Though the transcript phonetically identifies the Peeles as Noel Piel and Andre Piel (Doc. 34 5:10-11), the Court will identify them using the spelling found in the Police Statements unless directly quoting the Suppression Hearing transcript.

take anyone into custody and the charges had to be filed by mail. (*Id.* 20:3-8.) The officers left the scene after advising the parties that "[d]ue to the nature and circumstances, the charges would have to be filed via mail." (*Id.* 7:15-17.)

At approximately 10:30 a.m., the officers were advised that another altercation had taken place, "this time, involving a taser, a hand-held taser, and a firearm." (*Id.* 8:6-9.) Upon arrival at the scene, there was no altercation taking place outside, and the officers noted a white Chevrolet parked in the driveway of the 143 side of the house which had not been there when they left thirty minutes before. (*Id.* 8:13-17.) Miller described what happened next as follows:

> We knocked on the door [of 141, the downstairs unit] and spoke with the same three individuals, Sheila Rodriguez, Noel Piel and Andre Piel, inside the residence. In speaking with them, we, basically, interviewed one at a time, so I spoke with Noel first.
>
> Speaking with Noel, I learned that, pretty much, as soon as the police left the first time, the white car that I observed in the driveway had pulled in, and then, a short time later, there was a knock at the door of the 141 Second Avenue. Noel Piel stated that she opened the door of the residence and observed Nasheena Curry, who is the upstairs resident, another black female and a heavy-set black male in a black and red shirt standing outside.
>
> After she had opened the door, another physical altercation took place between Ms. Curry and Ms. Piel and Sheila Rodgriguez attempted to intervene to help stop the situation. At the time they tried to intervene, the . . . black male, in the black and red shirt, had displayed a firearm, which was initially concealed in his waistband and pointed it in their direction.

(Doc. 34 8:19-9:12.)

When asked if he observed any injuries at the time, Miller responded that "Noel Piel had very red scratches all over her face and arms, and, literally, her hair was falling out in, like, handfuls." (*Id.* 9:15-19.) He confirmed that the injuries he described had not been there when he previously responded to the scene and the injuries were greater than they had been the first time. (*Id.* 9:20-22, 18:7-11.)

Miller's Incident Report regarding the second altercation similarly described the events which had transpired. (*See* Doc. 20-1 at 1.) He recorded the following:

> After police officers left the residence from a prior disturbance, a white vehicle which was still in the driveway pulled up and parked. [Redacted] heard a knock at the door a short time later and answered the door. At the door was Nasheena CURRY, another black female, and a heavyset black male wearing a red and black shirt. CURRY pulled [redacted] out onto the porch. CURRY then began to punch and pull the hair of [redacted]. At this time, [redacted] mother [redacted] and brother [redacted] came onto the porch to assist [redacted]. The black male displayed a handgun and threatened [redacted] with the small black firearm. The second black female displayed a handheld "taser" and attempted to use it on [redacted] and eventually struck [redacted] with it. [Redacted] was being struck by CURRY on the porch while she was yelling for someone to call the police. [Redacted] eventually broke free and she ran back into 141 Second Ave with her family.

(Doc. 20-1 at 1.)

Miller testified that, after interviewing Noelle Peele, the officers separately interviewed Andre Peele and Sheila Rodriguez and their stories were consistent with Noelle's. (*Id.* 10:1-7.) Having learned that Ms. Curry and her companions had gone to the upstairs residence after the altercation, Miller testified that he and Blaski "safely got the

5

downstairs people out of there. We escorted them to their vehicle, told them to go to the police department where they could give a statement." (*Id.* 10:17-19.)

Blaski and Miller then checked the structure, ascertained that there was only one entrance point to the upstairs unit, and knocked on the door. (*Id.* 10:19-24.) The officers got no response to numerous knocks on the door and the only indication that anyone was in the unit was the smell of marijuana. (*Id.* 11:1-6.) They decided to conduct surveillance on the house to see if they could see someone leaving the house, and each officer went in a different direction about 150 yards north and south of the house. (*Id.* 11:8-15.) Blaski, who was south of the house, spoke with utility workers near the scene who stated that they did not see any of the disturbance, but described hearing the sound of a taser. (*Id.* 15:21-16:1.)

At about 11:30 a.m., Miller observed Nasheena Curry, another black female, and a black male wearing a black and red shirt, individuals who matched the description given by the Peeles and Ms. Rodriguez, leave the house and enter the white vehicle, back out of the driveway with Ms. Curry driving, and drive north. (*Id.* 11:18-12:8.) Miller immediately let Blaski know that the car had left, that he was behind it, and was going to stop the car. (*Id.* 12:10-12.) Blaski informed Miller that he had to go on another call on the opposite end of town, and he asked Miller to wait for him to get there and let him know which way the car was going. (*Id.* 12:13-15.) When asked why he did not immediately pull the car over, Miller testified that he decided to wait for someone to make the stop with him--based on his fifteen

6

years of experience he thought it would not be safe to stop a car with three people in it and probably a gun. (*Id.* 12:18-21.)

Upon learning from Miller that the car was headed toward Wilkes-Barre, Blaski ascertained that Wilkes-Barre officers would get there before he could so he let the dispatcher know that Wilkes-Barre should be notified. (*Id.* 13:1-7.) Miller testified that, after he had traveled about three-quarters of a mile into Wilkes-Barre, both Blaski and Officer Roper from Wilkes-Barre caught up with him and they stopped the vehicle. (*Id.* 13:17-21.) All three approached the car together and they each took one of the occupants into custody. (*Id.* 13:23-14:1.) The officers ran background checks and discovered that Defendant had several warrants against him. (*Id.* 14:24-15:1.) Defendant was arrested based on the outstanding warrants. (*Id.* 45:18-21.)

In an interview at the Kingston police station, Ms. Curry admitted that there was marijuana and a firearm at her residence and the firearm was hidden in the attic but it was not hers. (*Id.* 35:11-23.) In a videotaped interview, she acknowledged that an altercation had taken place, during the altercation the black male who was with her displayed a firearm, they went back in the house, and they would not answer the door. (*Id.* 36:23-37:1.) Ms. Curry further stated that she knew the black male, whom she knew as "Shamu," was wanted, and, when they made a decision to leave, she did not want him riding with the gun in the car so he lifted her up to hide the firearm in the attic. (*Id.* 36:25-37:5.) State charges based on the second altercation were filed against Ms. Curry. (*Id.* 37: 11-14.)

After all suspects were in custody, Blaski secured Curry's residence. (Doc. 18-1 at 7.) Later that day, officers conducted a search of the residence pursuant to a warrant issued by a magistrate district justice and approved by an assistant district attorney. (*Id.*) Officers found and seized numerous bags of marijuana and a silver/black Kahr Arms 40 caliber handgun with an obliterated serial number. (*Id.*) Another search warrant resulted in the obtaining of DNA from Defendant. (Doc .41 at 3.)

The pending federal charges are based on the handgun seized in the search conducted on October 5, 2017.

### III. ANALYSIS

With the pending Motion, Defendant seeks to have the evidence obtained as a result of the October 5, 2017, traffic stop suppressed, i.e., he seeks suppression of the handgun and the DNA sample. (*See, e.g.*, Doc. 41 at 4.) Specifically, Defendant now argues that this evidence should be suppressed on the following grounds:

> the investigatory stop of his vehicle on October 5 in Wilkes-Barre was not reasonable because the officers had no basis to conclude that he was involved in any criminal activity. The fact that he may have possessed a firearm at 141-143 earlier that day and he may have pointed it at someone to stop them from intervening in an altercation, does not constitute a crime. The record contains no evidence that Green used or threated [sic] to use the firearm at the time. The record shows that he merely possessed it, which is not a crime.

(Doc. 41 at 4.)

The Fourth Amendment guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ... and no Warrants shall

> issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (West 2002). As stated in *United States v. Butler*, 405 F. App'x 652 (3d Cir. 2010),

> [t]his provision limits government action in two related ways. First, it requires that the government conduct only reasonable searches and seizures. Second, it sets out (albeit at a high level of generality) the prerequisites that government officials must complete before executing a search or seizure, which include obtaining a warrant. "The Supreme Court has read the Amendment's twin commands in tandem, holding that when people have a reasonable expectation of privacy in their persons or effects, all searches and seizures must be supported by a warrant, unless they fall into one of the exceptions to that requirement." *United States v. Hartwell*, 436 F.3d 174, 177 (3d Cir.2006) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

*United States v. Butler*, 405 F. App'x 652, 655 (3d Cir. 2010). "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985).

As recently explained by the United States Supreme Court in *Kansas v. Glover*, 140 S. Ct. 1183 (2020),

> [u]nder this Court's precedents, the Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); see also *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the

9

> evidence, and obviously less than is necessary for probable cause." *Prado Navarette v. California*, 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014) (quotation altered); *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).
>
> Because it is a "less demanding" standard, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). The standard "depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act." *Navarette, supra*, at 402, 134 S.Ct. 1683 (quoting *Ornelas v. United States*, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (emphasis added; internal quotation marks omitted)). Courts "cannot reasonably demand scientific certainty ... where none exists." *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Rather, they must permit officers to make "commonsense judgments and inferences about human behavior." *Ibid.*; see also *Navarette, supra*, at 403, 134 S.Ct. 1683 (noting that an officer " 'need not rule out the possibility of innocent conduct' ").

*Kansas v. Glover*, 140 S. Ct. at 1187–88. Stating that the Supreme Court "precedents . . . repeatedly affirmed that the ultimate touchstone of the Fourth Amendment is reasonableness," the Court emphasized that "[t]he standard takes into account the totality of the circumstances—the whole picture." *Id.* at 1191 (internal quotations and citations omitted). In *United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002), the Court of Appeals for the Third Circuit noted that

> [t]he Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences . . . , personal observation of suspicious behavior . . . , information from sources that have proven to be reliable, and information from sources that—while unknown to the police—prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip.

10

284 F.3d at 478.

Under the exclusionary rule "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra,* 414 U.S. 338, 347, (1974). This prohibition also applies "to the fruits of the illegally seized evidence." *Id.* The rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* at 348; *United States v. Leon,* 468 U.S. 897, 906 (1984).

The Factual Background set out above shows that there is no dispute that two altercations took place on October 5, 2017, and the three individuals in the car stopped by Kingston and Wilkes-Barre police officers were involved in the second altercation. The evidence also demonstrates that the officers who stopped the white Chevrolet had "a particularized and objective basis" for suspecting that an individual or individuals in the vehicle were involved in criminal activity. *Cortez,* 449 U.S. at 417-18. Considering "the totality of the circumstances," evidence shows that Miller and Blaski had knowledge of the second altercation through interviews with the Peeles and Ms. Rodriguez, and they knew Ms. Curry by sight based on their interview with her following the first altercation. The officers observed injuries to Noelle Peele which were more serious than those observed after the first altercation. It was corroborated by Ms. Peele and the witnesses that Nasheena Curry had inflicted the injuries, her male companion had brandished a handgun,

11

and her female companion had activated a taser. The officers' attempts to speak with Ms. Curry following the second altercation were unsuccessful—though they had been told Ms. Curry and her companions had gone into the upstairs residence after the second altercation, their knocks on the door went unanswered. The officers' suspicion that the trio was in Ms. Curry's residence choosing not to respond to their knocking was confirmed from Miller's stake-out position approximately 150 yards north of the house when he observed Ms. Curry exit her residence with the two individuals who matched the descriptions given by Ms. Rodriguez and the Peeles and he saw them drive away from the scene in the car later stopped in Wilkes-Barre, following the vehicle at all times. Thus, several factors identified in *Nelson* as relevant to the reasonable suspicion inquiry are present here: specialized knowledge, investigative inferences, personal observation of the results of reportedly assaultive behavior, and information from sources whose reliability was shown by individual interviews. *See Nelson*, 284 F.3d at 478.

In his post-hearing brief, Defendant points to alleged discrepancies as to what Miller observed in terms of physical injuries, stating that "[a]t the hearing, defense counsel cross examined Miller concerning some discrepancies as to what he observed in terms of physical injuries [sic] one of the residents at 141 Second Avenue." (Doc. 41 at 3-4.) Defendant's brief does identify the discrepancy or elaborate how it supports suppression of the evidence at issue. (*See Id.*) By way of additional information on the issue, Defendant's brief states that "[i]n a letter filed with the Court of December 16, 2020, Green emphasized these

inconsistencies." (*Id.* at 4.) While Defendant's *pro se* correspondence provides more detailed allegations of inconsistency regarding injuries and attaches statements from Sheila Rodriguez and her daughter Noelle Peele, the allegations do not point to a basis for suppression and are not substantiated by the victim statements. (*See* Doc. 39.)

In her written statement, Ms. Rodriguez reported that Ms. Curry had grabbed Ms. Peele's hair and scratched her face during the first altercation and also attacked her during the second altercation. (Doc. 39 at 4.) Ms. Peele's statement indicates that Ms. Curry's first attack included hair-pulling and, during the second attack, Ms. Curry dragged her out of her mother's residence by her hair and the attack continued with more hair-grabbing and an attack to her face. (*Id.* at 6-7.) Nothing in these statements is inconsistent with Miller's testimony that he observed minor injuries after the first altercation and more significant, readily visible injuries after the second altercation. *See supra* pp. 3, 5. Miller testified as to what he *observed*; Ms. Rodriquez and Ms. Peele provided statements as to what *occurred*. The fact that scratches or other trauma appeared to be minor after the first altercation does not undermine Miller's report that he observed more injury to Ms. Peele after the second altercation. Moreover, as to the impact of any alleged discrepancy on the suppression inquiry, the bottom line is that Miller testified that he observed additional injuries after the second altercation and his observation of those injuries and the witness/victim on-scene reports of how they occurred are properly part of the totality of the circumstances

considered when determining whether the officers reasonably believed that criminal activity had occurred.

Defendant's assertion that the officers had no basis to conclude that he was involved in any criminal activity is also unavailing. (*See* Doc. 41 at 4.) His statement that "[t]he fact that he may have possessed a firearm at 141-143 earlier that day and he may have pointed it at someone to stop them from intervening in an altercation, does not constitute a crime," (Doc. 41 at 4), even assumed *arguendo* to be accurate, does not show that the reasonableness of the officer's stop is not supported by the totality of the circumstances.

Whatever specific criminal activity could be related to Defendant's brandishing of a firearm is not the essential question in discerning whether the stop was reasonable. Rather, as laid out above, the totality of the circumstances supports the reasonableness of the stop in that the trio in the car, including Defendant, was directly linked to the second altercation where Ms. Peele incurred visible injury. Defendant's precise role in the event and his subjective intent are not central to the reasonableness inquiry. Officers had been informed by those present at the scene that Defendant had threateningly brandished a handgun during the altercation and another individual had activated a taser. Together with their observation of Noelle Peele's injuries, reportedly inflicted by Nasheena Curry, the officers had an objective basis to believe criminal activity had taken place, the three individuals who left the upstairs unit were involved in the activity, and further investigation was needed. No evidence undermines the Government's position that officers acted reasonably in crediting

the consistent reports of the three individuals they had interviewed and stopping the vehicle in which the alleged perpetrators of the incident had left the scene. Thus, no Fourth Amendment violation occurred when they stopped the white Chevrolet. *See, e.g., Glover*, 140 S. Ct. at 1187-88.

Finally, the Court notes that Defendant's implication that he was innocently present at the scene is unsupported by the record. Contrary to his statement that "[t]he record contains no evidence that Green used or threated [sic] to use the firearm at the time [and] [t]he record shows that he merely possessed it," (Doc. 41 at 4), Miller's Incident Report indicates that the black male who accompanied Ms. Curry during the second altercation, i.e., Defendant, "displayed a handgun and threatened [redacted] with the small black firearm." (Doc. 20-1 at 1.) Ms. Rodriguez's statement indicates the same: "[Ms. Curry] fought my daughter, she grabbed me also and her friends tried to defend her with a taser + threatened my son with a gun." (Doc. 39 at 5.) Thus, both the Incident Report and Ms. Rodriguez's statement indicate that the record contains evidence that Defendant did more than "merely posess[ ]" a firearm.[3]

---

[3] In his supporting brief, Defendant asserted that the traffic stop was unlawful because it was prohibited by the Rules of Criminal Procedure of Pennsylvania and occurred outside the primary jurisdiction of the Kingston Municipal Police Department. (Doc. 18 at 4-5.) He did not renew these grounds for suppression in his supplemental brief (Doc. 41). Though Defendant appears to have abandoned these arguments, the Court, out of an abundance of caution, will briefly address these bases for relief. Both arguments are grounded in 42 Pa. C.S. § 8953, Pennsylvania's Municipal Police Jurisdiction Law. If pursued, suppression based on § 8953 would not be warranted for the reasons asserted by the Government in its responsive brief: 1) it is clear from the Dispatch Report that Wilkes-Barre City Police Officers were present at the stop; and 2) even if the stop violated the Pennsylvania Municipal Police Jurisdictional Law, an arrest based on probable cause is valid under the Fourth Amendment even if it

In sum, based on the testimony presented at the Suppression Hearing as corroborated by other evidence of record, the totality of circumstances in this case supports the reasonableness of the stop of the vehicle in which Defendant was a passenger. Thus, no Fourth Amendment violation occurred and suppression of the evidence obtained as a result of the stop is not warranted.

### IV. CONCLUSION

For the reasons discussed above, Defendant's Motion to Suppress Evidence (Doc. 17) will be denied. A separate Order is filed simultaneously with this Memorandum Opinion.

_____
Robert D. Mariani
United States District Judge

---

violates state law. (Doc. 20 at 8 (citing *United States v. Sed*, 601 F.3d 224, 228 (3d Cir. 2010) (citing *Virginia v. Moore*, 553 U.S. 164 (2008)).)