THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 3:20-CR-165 |
| | : | (JUDGE MARIANI) |
| LANCE GREEN, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION
### I. INTRODUCTION

Here the Court considers Defendant's oral motion to dismiss this case. On the day

the trial in the above-captioned matter was scheduled to begin, Defendant's counsel

informed the Court Deputy that there was something he wanted to bring to the Court's

attention. Before potential jurors were brought to the courtroom, the Court convened and

Defendant's counsel made an oral motion to dismiss the case on the basis of misconduct

before the Grand Jury. He identified two grounds for dismissal. First, the Grand Jury

testimony consisted of reading the transcripts of grand jury testimony from two previous

grand jury hearings, each of which resulted in indictments which were ultimately dismissed

on speedy trial grounds. Second, there was an error in a question posed in a prior hearing

which, as part of the transcript of that hearing, was read to the Grand Jury in this case. The

question involved the timing of when a search warrant was obtained for Defendant's DNA.

## II. BACKGROUND

Defendant is currently charged under the Indictment filed on July 14, 2020.  (Doc. 1.)

Count 1 charges a violation of 18 U.S.C. § 922(g), prohibited person in possession of a

firearm; Count 2 charges a violation of 18 U.S.C. § 922(k), possession of a firearm with an

obliterated serial number.  The indictment is the third filed based on events which took place

on or about October 5, 2017.

On October 5, 2017, at approximately 10:00 a.m. two officers from the Kingston

Municipal Police Department, Robert Miller and Sam Blaski, were dispatched to respond to

a neighborhood dispute at 141-143 Second Avenue in Kingston, Pennsylvania, the

addresses being the downstairs and upstairs units of one structure.  (Doc. 34, Suppression

Hr'g Tr. 4:19-5:13.)  They arrived at the scene separately and first interviewed the

downstairs residents Noelle Peele, Andre Peele, and Sheila Rodriguez who reported an

altercation with the upstairs resident, Nasheena Curry.[1]  (*Id.* 5:7-11, 16-17, 7:1-3.)

According to Miller's testimony and a redacted Police Incident Report, officers were told that

Noelle Peele and Nasheena Curry had a physical altercation and Ms. Curry, during a phone

call, had been heard by Ms. Peele and Ms. Rodriguez telling someone to "bring the strap,"

which is street terminology for a firearm.  (*Id.* 7:1-12; Incident Rpt., Doc. 40-1 at 4.)  The

---

[1] According to Police Statements completed by Sheila Rodriguez and Noelle Peele attached to Defendant's *pro se* correspondence with the Court docketed on December 16, 2020, Sheila Rodriquez is the mother of Noelle and Andre Peele. (Doc. 39 at 4-7.)  Though the transcript phonetically identifies the Peeles as Noel Piel and Andre Piel (Doc. 34 5:10-11), the Court will identify them using the spelling found in the Police Statements unless directly quoting the Suppression Hearing transcript.

officers left the scene after advising the parties that "[d]ue to the nature and circumstances, the charges would have to be filed via mail." (Doc. 34, Hr'g Tr. 7:15-17.)

At approximately 10:30 a.m., the officers were advised that another altercation had taken place, "this time, involving a taser, a hand-held taser, and a firearm." (*Id.* 8:6-9.) Upon arrival at the scene, there was no altercation taking place outside, and the officers noted a white Chevrolet parked in the driveway of the 143 side of the house which had not been there when they left thirty minutes before. (*Id.* 8:13-17.)   After again interviewing Sheila Rodriguez, Noelle Peele and Andre Peele, the officers learned that the second altercation involved Nasheena Curry and two additional individuals, another black female and a heavy-set black male in a black and red shirt standing outside, and the male had displayed a firearm, which was initially concealed in his waistband, and pointed it in their direction. (*Id.* 8:19-9:12.)

Having learned that Ms. Curry and her companions had gone to the upstairs residence after the altercation, Blaski and Miller attempted to speak with the individuals but got no response when they knocked on the door. (*Id.* 10:17-11:6.)  They then decided to conduct surveillance on the house to see if they could see someone leaving the house, and each officer went in a different direction about 150 yards north and south of the house. (*Id.* 11:8-15.)

At about 11:30 a.m., Miller observed Nasheena Curry, another black female, and a black male wearing a black and red shirt, individuals who matched the description given by

3

the Peeles and Ms. Rodriguez, leave the house and enter the white vehicle, back out of the driveway with Ms. Curry driving, and drive north. (*Id.* 11:18-12:8.) Miller immediately let Blaski know that the car had left, that he was behind it, and was going to stop the car. (*Id.* 12:10-12.) Upon learning from Miller that the car was headed toward Wilkes-Barre, Blaski ascertained that Wilkes-Barre officers would get there before he could so he let the dispatcher know that Wilkes-Barre should be notified. (*Id.* 13:1-7.) Shortly thereafter, Miller, Blaski, and Officer Roper from Wilkes-Barre stopped the vehicle and took the occupants into custody. (*Id.* 13:17-14:1.) The officers ran background checks and discovered that Defendant had several warrants against him. (*Id.* 14:24-15:1.) Defendant was arrested based on the outstanding warrants. (*Id.* 45:18-21.)

In an interview at the Kingston police station, Ms. Curry admitted that there was marijuana and a firearm at her residence and the firearm was hidden in the attic but it was not hers. (*Id.* 35:11-23.) In a videotaped interview, she acknowledged that an altercation had taken place, during the altercation the black male who was with her displayed a firearm, they went back in the house, and they would not answer the door. (*Id.* 36:23-37:1.) Ms. Curry further stated that she knew the black male, whom she knew as "Shamu," was wanted, and, when they made a decision to leave, she did not want him riding with the gun in the car so he lifted her up to hide the firearm in the attic. (*Id.* 36:25-37:5.) State charges based on the second altercation were filed against Ms. Curry. (*Id.* 37:11-14.)

4

After all suspects were in custody, Blaski secured Curry's residence.  (Doc. 18-1 at

7.)  Later that day, officers conducted a search of the residence pursuant to a warrant

issued by a magistrate district justice and approved by an assistant district attorney.  (*Id.*)

Officers found and seized numerous bags of marijuana and a silver/black Kahr Arms 40

caliber handgun with an obliterated serial number.  (*Id.*)  Another search warrant resulted in

the obtaining of DNA from Defendant.  (Doc .41 at 3.)

## III. LEGAL FRAMEWORK

In *Bank of Nova Scotia v. United States,* 487 U.S. 250, 260 (1988). the United States

Supreme Court held that "as a general matter, a district court may not dismiss an indictment

for errors in grand jury proceedings unless such errors prejudiced the defendants."  487

U.S. 250, 260 (1988).  "The prejudicial inquiry must focus on whether any violations had an

effect on the grand jury's decision to indict." *Id.* at 263.  The indictment should be dismissed

only "[i]f violations did substantially influence this decision, or if there is grave doubt that the

decision to indict was free from such substantial influence."  *Id.*

In *United States v. Wander*, 601 F.2d 1251 (3d Cir. 1979), a grand jury, in 1978,

heard evidence of one live witness and the transcript testimony of other witnesses was read

to the grand jury (evidence against the defendants was originally presented to a grand jury

in 1976).  On the defendants' claim that the district court should have dismissed the

indictments on this basis, the Third Circuit stated as follows:

> The general rule concerning the propriety of the indictment procedure is that
> "(a)n indictment returned by a legally constituted and unbiased grand jury, . . .

if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). It is permissible for an indictment to be based on hearsay evidence. *Id.* In addition, indictments returned after the grand jury has heard transcript testimony have been sustained. *See United States v. Chanen*, 549 F.2d 1306 (9th Cir. 1977); *United States v. Blitz*, 533 F.2d 1329, 1344 (2d Cir. 1976).

In urging reversal, the defendants rely primarily on a rule developed in the Second Circuit in *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972). That rule has been summarized as follows:

> (A)n indictment based on hearsay is invalid where (1) non-hearsay evidence is readily available; (2) the grand jury is misled into believing it was hearing direct testimony rather than hearsay; and (3) there is high probability that had the grand jury heard the eye witness it would not have indicted.

*United States v. Cruz*, 478 F.2d 408, 410 (5th Cir.), Cert. denied, 414 U.S. 910 (1973).

*United States v. Wander*, 601 F.2d 1251, 1260 (3d Cir. 1979).  The Circuit Court applied the three-part test adopted by the Second and Fifth CIrcuits and concluded that the second and third requirements had not been met.  On the facts of the case, *Wander* held that the reading of transcript testimony of witnesses before a prior grand jury to the grand jury in a subsequent case did not amount to an abuse of the grand jury process.  *Id.*

In *United States v. Kruckel*, Crim. No. 92-611, 1993 WL 765648 (D.N.J.  Aug. 13, 1993), the defendants moved to dismiss a Second Superseding Indictment in its entirety based upon certain purported irregularities in the procedures invoked by the Government before the grand jury which returned that indictment.  The issue presented was whether an indictment is procedurally defective because it was obtained through a procedure of reading

back transcripts of testimony given before a previous grand jury, except for a sole live

witness who testified regarding three new counts against one of the defendants. *Id.* at *2.

The district court explained that

> [t]he question put to the court . . . is whether this procedure is so highly irregular
> that the grand jury was prevented from performing its independent investigatory
> functions and was thus impermissibly transformed into a rubber stamp for the
> Government, in a manner inconsistent with defendants' Fifth Amendment right
> to indictment by a grand jury.
>
> The supervisory role of a district court over a grand jury's proceedings
> is a very limited one. *United States v. Williams,* 504 U.S. 36, 112 S.Ct. 1735,
> 1744 (1992). "Because the grand jury is an institution separate from the courts,
> over whose functioning the courts do not preside," the Supreme Court recently
> cautioned that no general "supervisory" judicial authority exists over grand jury
> proceedings. *Id.* at 1742. Also relevant to the present discussion is the fact that
> the Court has upheld grand jury indictments based exclusively on hearsay
> evidence. *Costello v. United States,* 350 U.S. 359 (1956).
>
> Notwithstanding these limitations on the power of this district court and
> the fact that hearsay evidence is perfectly permissible to support a grand jury
> indictment, the court was troubled by the fact that the Government was unable
> to cite a single case in which *no* live testimony was presented to an indicting
> grand jury. Even in *Costello,* for example, although the grand jurors heard only
> hearsay testimony, they at least were presented with the live testimony of three
> government agents, whom they could question and evaluate. And in *United
> States v. Wander,* 601 F.2d 1251 (3d Cir.1979), the grand jury heard the
> testimony of one live witness in addition to "read-backs" of earlier testimony
> provided to an earlier grand jury. The Third Circuit in particular has voiced
> concerns over certain grand jury procedures, *see, e.g., United States v.
> Provenzano,* 688 F.2d 194 (3d Cir.), *cert. denied,* 459 U.S. 1071 (1982)
> (regarding practice of having a number of grand juries hear testimony which
> the indicting grand jury ultimately uses as a basis for indictment); *United States
> v. Helstoski,* 635 F.2d 200 (3d Cir.1980) (regarding inability of indicting grand
> jury to observe demeanor of all witnesses who testified), and this court was
> similarly disturbed by the prospect that a grand jury hearing only transcript
> read-backs was deprived of its ability to perform the essential evidence-
> gathering and evaluative functions of the grand jury system.

> For example, one could imagine a situation in which the exclusive use of read-backs of testimony from a previous grand jury proceeding might result in the later grand jury being caused to believe it was engaging in an empty exercise requiring it to simply correct some previous technical defect without exercising its evidence-gathering and deliberative functions.

*United States v. Kruckel*, No. CRIM. A. 92-611(JBS), 1993 WL 765648, at *3–4 (D.N.J. Aug. 13, 1993).

To ascertain whether the grand jury proceedings were sufficiently regular that a dismissal of the indictment was not in order, the presiding judge directed the Assistant United States Attorney who presided over the proceedings to provide the court with an *in camera* submission in the form of an affidavit responding to certain of the court's concerns. The court noted that "the *in camera* submission preserved the necessary secrecy of the grand jury proceedings, while inquiring beyond the level of generality in the Government's disclosures in open court." *Id.* at *4 n.4.[2]

The presiding judge ordered that the Assistant United States Attorney answer the following questions:

---

[2] The court further noted that this procedure is consistent with Rule 6(e)(3)(C)(ii), Fed.R.Crim.P., which provides:

> Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—
> (ii) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

*Kruckel*, 1993 WL 765648, at *4 n.4.  This provision is now found in Rule 6(3)(3)(E)(ii).

1. What was the new Grand Jury told regarding prior indictments in this case?

2. What was the new Grand Jury told about their functions in considering the Second Superseding Indictment with respect to their opportunity to call and cross-examine witnesses and their opportunity to accept or reject the testimony contained in the transcripts?

3. What other measures were taken to ensure the procedural regularity of the new Grand Jury proceedings?

4. Did any grand juror ask to call witnesses? If so, what happened?

5. What other information supports the regularity of the procedure used for the new Grand Jury's consideration of the evidence supporting the Second Superseding Indictment?

*Kruckel*, 1993 WL 765648, at *4 n.5. Ultimately the court was satisfied that the Affidavit confirmed that the proceedings were sufficiently regular that dismissal of the indictment was not appropriate, stating that the AUSA's "Affidavit sufficed to ensure that the grand jury was not a 'rubber stamp' for the prosecution such that its fundamental independent investigatory functions were abandoned." *Id.* at *4. The court also noted that the *Wander* test had not been satisfied: the grand jury was not misled into believing it was hearing direct testimony rather than hearsay and there was not a high probability that had the grand jury heard eyewitnesses it would not have indicted. *Id.* at *4 n.6. As to the latter, the court reasoned that the earlier grand jury which did hear the live witnesses returned an indictment similar in material respects to the Second Superseding Indictment. *Id.*

## IV. ANALYSIS

The Court directed the Assistant United States Attorney ("AUSA") in this matter to submit the relevant transcript and to provide an affidavit addressing the questions set out in *Kruckel* for the Court's *in camera* review. The AUSA has now done so.[3]

The transcript from the July 14, 2020, Grand Jury proceeding indicates that one witness was presented, Special Agent Ryan Kovach from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") who was involved with the investigation of the charges against Lance Green. Following a brief introduction, the AUSA informed the Grand Jury that Agent Kovach would be the only witness the Government intended to present. After he was duly sworn by the Foreperson of the Grand Jury, the AUSA indicated that Agent Kovach would "be reading two transcripts into the record from prior hearings."

Following the reading of the transcripts, the AUSA asked Agent Kovach to step out and asked the Grand Jury if anyone had questions regarding the proposed indictment and if anyone would like her to read the elements of the two counts or the indictment again. There being no response, the AUSA then left the indictment and the voting sheet with the Grand Jury. Shortly thereafter, the matter was recalled and the Grand Jury informed the AUSA

---

[3] The Court notes that Defendant did not seek disclosure of any further material related to the Grand Jury proceeding of July 14, 2020. Thus, discussion of the framework within which the release of grand jury information should be disclosed is not warranted. *See, e.g., United States v. Buckner*, Crim. No. 3:18-CR-349, 2020 WL 211403, at *5 (M.D. Pa. Jan. 13, 2020).

that they had a true bill at which time the AUSA said she would take the indictment and sign it.

The Court will now turn to the AUSA's responses to the specific questions identified in *Kruckel.* 1993 WL 765648, at *4 n.5.

Regarding the first question ("What was the new Grand Jury told regarding prior indictments in this case?" 1993 WL 765648, at *4 n.5), the Affidavit indicates that the Grand Jury was not told that there was a previous indictment of Lance Green.  Further, the transcript shows that only "prior hearings" were mentioned.

Regarding the second question ("What was the new Grand Jury told about their functions in considering the . . . Indictment with respect to their opportunity to call and cross-examine witnesses and their opportunity to accept or reject the testimony contained in the transcripts?" 1993 WL 765648, at *4 n.5), the Affidavit provides information about the opening instructions to the Grand Jury delivered by the Honorable Malachy E. Mannion and the United States Attorney's Office's standard procedure for the orientation of grand juries. The Grand Jury is generally advised that the grand jury alone decides how many witnesses they want to hear from, that they can direct the Government's attorney to subpoena witnesses from anywhere in the country, and that they may question witnesses.  During orientation by the AUSA, the Grand Jury is informed that hearsay is admissible, that law enforcement witnesses will often summarize information obtained from witnesses and records, and that the Grand Jury may hear directly from witnesses or review evidence if

11

they would like to do so.  The Grand Jury is also told that they may ask a witness questions and, if they have concerns about sufficiency of the evidence during deliberations, they may consider consulting with the AUSA to attempt to address their concerns through additional evidence or testimony.

Two other points are noteworthy here.  First, this case did not involve a superseding indictment and no previous indictment was mentioned.  Second, the Court's instruction to the grand jury emphasizes their role as an independent body and specifically instructs the Grand Jury as follows: "You would violate your oath if you merely 'rubber-stamped' indictments brought to you by the government representatives."

In her Affidavit, the AUSA indicates in response to the third question ("What other measures were taken to ensure the procedural regularity of the new Grand Jury proceedings?" 1993 WL 765648, at *4 n.5), that normal procedures were followed.  Agent Kovach was a live witness who testified by reading his own prior testimony to the Grand Jury which, by all indications,  is the normal procedure in this United States Attorney's office when a witness had previously testified.

Regarding the fourth question ("Did any grand juror ask to call witnesses? If so, what happened?" 1993 WL 765648, at *4 n.5), the Affidavit confirms what the transcript shows, i.e., that no grand juror asked to call witnesses and, when asked, no grand juror had any questions of Agent Kovach.

As to the fifth and final question ("What other information supports the regularity of the procedure used for the new Grand Jury's consideration of the evidence supporting the . . . Indictment?" 1993 WL 765648, at *4 n.5), the Affidavit references the transcript attached to the Affidavit which the AUSA states is the entirety of the presentation on July 14, 2020.

The Court concludes that the AUSA's submissions support a finding that the reading of transcripts from prior hearings at the the July 14, 2020, Grand Jury proceedings does not warrant dismissal of the indictment. Rather, with the witness approach adopted by the AUSA, the proceedings were sufficiently regular to support the presumption of propriety.

Having made this determination, the Court will also assess whether the circumstances of this case warrant dismissal under *Wander*. Assuming the continued validity of the three-part test identified in *Wander*,[4] the Court will now address whether "(1)

---

[4] Questions regarding continued validity of the test set out in *Wander* relate to the Supreme Court's decision in *United States v. Williams*, 504 U.S. 36 (1992).

The Supreme Court's . . . decision in *United States v. Williams,* 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), has cast doubt on the continuing validity of the *Estepa* line of cases [which includes *Wander*]. *Williams* held that a district court may not dismiss an otherwise valid indictment because the government failed to disclose to the grand jury exculpatory evidence that was in its possession. *Id.* at 47. In reaching this conclusion, the Court cautioned that "[b]ecause the grand jury is an institution separate from the courts, over whose functioning the courts do not preside," no general " 'supervisory' judicial authority exists" over grand jury proceedings. *Id.* *Williams* also noted that "over the years, we have received many requests to exercise supervision over the grand jury's evidence-taking process, but we have refused them all." *Id.* It further explained that:

[W]e reaffirmed [a principle of *Costello* ] recently in *Bank of Nova Scotia,* where we held that "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment," and that "a challenge to the reliability or competence of the evidence presented to the grand jury" will not be heard. 487 U.S. at 261. It would make little sense, we think, to abstain from reviewing the evidentiary support for the grand

non-hearsay evidence [was] readily available; (2) the grand jury [was] misled into believing it was hearing direct testimony rather than hearsay; and (3) there [was] high probability that had the grand jury heard the eye witness it would not have indicted." 601 F.2d at 1260.

Some courts have defined "non-hearsay evidence" to include the reading of the transcripts "in toto" from a prior proceeding. *See*, *e.g.*, *United States v. Mahoney*, 495 F. Supp. 1270 (E.D. Pa. 1980). Here, because Agent Kovach read his own testimony from prior proceedings into the record, the hearsay/non-hearsay line is somewhat blurred. However, rather than parse this issue, the Court will proceed on the assumption that Agent Kovach's testimony was hearsay. Cleary actual testimony from the witness, Agent Kovach, was readily available. Therefore, the first *Wande*r requirement is satisfied.

The second requirement to overcome the presumption of regularity, "that the grand jury [was] misled into believing it was hearing direct testimony rather than hearsay," 601 F.2d at 1260, is not satisfied here. The transcript clearly indicates that the Grand Jury knew that it was being read the transcript of the testimony from two previous hearings.

---

jury's judgment while scrutinizing the sufficiency of the prosecutor's presentation. A complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was "incomplete" or "misleading."

*Id.* at 54 (footnote omitted). The Court offered *Estepa* as an example of a case where a challenge to the quality of the evidence was styled as a challenge to the prosecutor's presentation. *Id.* at 54 n. 8. Thus, while *Williams* did not explicitly overrule *Estepa* (and *Wander* ), it did seem to reject the logic of those cases and reiterate *Costello's* holding that it is inappropriate for the federal courts to scrutinize the grand jury's evidentiary process, including its use of hearsay evidence.

*United States v. Jiminez*, Crim. No. 99-364-08, 2005 WL 3183664, at *11-12 (E.D. Pa. Nov. 29, 2005).

Finally, a review of the transcript shows that the third requirement is not met. Nothing suggests that "there is high probability that had the grand jury heard the eye witness it would not have indicted." 601 F.2d at 1260. As in *Kruckel* where the court reasoned that the earlier grand jury which did hear the live witnesses returned an indictment similar in material respects to the Second Superseding Indictment, 1993 WL 765648, at *4 n.6, here the fact that two earlier grand juries had returned indictments the same as the one returned based on the July 14, 2020, proceeding supports a conclusion that direct testimony would have not changed the outcome. This is particularly so given the fact that Agent Kovach himself read his own prior testimony at the Grand Jury proceeding.

Thus, as in *Wander* where the Court found that the second and third requirements were not met, here the Court concludes that the reading of the transcripts of prior hearings to the Grand Jury does not amount to an abuse of the Grand Jury process.

This conclusion is bolstered by decisions in other circuits where the reading of testimony from a prior proceeding was not objectionable.

> Even if some of the testimony read to the second grand jury had been received by the first grand jury after the expiration of its term, *see United States v. Fein*, 405 F.2d 1170 (2 Cir. 1974), and therefore was hearsay, ". . . an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence. . . ." *United States v. Calandra*, 414 U.S. 338, 345 (1974). *See United States v. James*, 493 F.2d 323, 326, and cases there cited (2 Cir.), cert. denied, 419 U.S. 849 (1974).
>
> Mindful of our concern that a prosecutor shall not put into issue at trial his credibility or professional integrity, *United States v. Spangelet*, 258 F.2d 338, 342-43 (2 Cir. 1958), we hold here that the prosecutor did not place his credibility on the line with the ministerial act of reading prior testimony to the

15

grand jury any more than when counsel reads at trial properly admitted prior testimony, whether in the form of a deposition, grand jury testimony or otherwise.

*United States v. Blitz*, 533 F.2d 1329, 1344–45 (2d Cir. 1976).

In *United States v. Chanen*, 549 F.2d 1306, 1311 (9th Cir. 1977), confronted with the issue of whether reading transcripts of prior grand jury testimony to a subsequent grand jury warranted dismissal of the indictment, the Ninth Circuit explained that

> [o]n occasion, and in widely-varying factual contexts, federal courts have dismissed indictments because of the way in which the prosecution sought and secured the charges from the grand jury. *See, e. g., United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972); *United States v. Wells*, 163 F. 313 (D.Idaho 1908); *United States v. DeMarco*, 401 F.Supp. 505 (C.D.Cal.1975), appeal docketed, No. 75-3824, 9th Cir. Dec. 29, 1975; *United States v. Gallo*, 394 F.Supp. 310 (D.Conn.1975). These dismissals have been based either on constitutional grounds or on the court's inherent supervisory powers. *See generally United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974); id. at 793 (Hufstedler, J., concurring*); United States v. Estepa, supra*, 471 F.2d 1132. Whatever the basis of the dismissal, however, the courts' goal has been the same, "to protect the integrity of the judicial process," United States v. Leibowitz, 420 F.2d 39, 42 (2d Cir. 1969), particularly the functions of the grand jury, from unfair or improper prosecutorial conduct.
>
> Almost every court dealing with the issue raised here has confronted a novel set of facts. The range of prosecutorial conduct capable of inspiring allegations of unfairness appears unlimited. Indeed, the facts of this case are unlike those of any other we have been able to find. Nevertheless, a review of the cases, with particular regard for their facts, serves to define the line between prosecutorial conduct which is inimical to "the integrity of the judicial process" and conduct which does not require dismissal of the indictment.

549 F.2d 1306 at 1309 (9th Cir. 1977).  With this background, the Circuit Court applied the same test as that applied in *Wander* and concluded that "[r]eading transcripts of sworn testimony, rather than presenting live witnesses, simply does not constitute, on the facts of

this case, 'fundamental unfairness' or a threat to 'the integrity of the judicial process.'" *Id.* at 1311.

In sum, broad authority supports the Court's determination that, given the facts of this case and the information reviewed by the Court, no error occurred in the Grand Jury proceedings of July 14, 2020, regarding the reading of transcripts.  Finding no error in reading the transcripts, the Court does not reach the prejudice prong of the *Bank of Nova Scotia* inquiry.  *See* 487 U.S. at 260.

The Court will now turn to the claimed error regarding the DNA warrant question which, as a question posed at a prior proceeding, was read into the record at the July 14, 2020, proceeding.  The AUSA concurs that the question--"Following your testimony in front of the Grand Jury, was a search warrant obtained for Lance Green's DNA?"—contains an error.  The parties agree that the question is inaccurate because the search warrant for the DNA was obtained before Agent Kovach's grand jury testimony rather than after it.  Thus, based on *Bank of Nova Scotia's* directive that  "a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants," 487 U.S. at 260, the Court will consider whether this error prejudiced Defendant.

"The prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict." *Id.* at 263. The indictment should be dismissed only "[i]f

violations did substantially influence this decision, or if there is grave doubt that the decision to indict was free from such substantial influence." *Id.*

Defendant posits that the error was prejudicial because the question implies that there was an indictment, i.e., that the search warrant was issued because there were pending charges. The Government contends that the error was a minor factual mistake that had no bearing on the Grand Jury finding of probable cause.

Here the requisite standard is not satisfied. The facts of this case and the information before the Grand Jury do not provide a basis to conclude that the error in the DNA question had an effect on the Grand Jury's decision to indict. Contrary to Defendant's argument that the question implied that there had been an indictment, the Court concludes that no reasonable inference could be drawn that a prior grand jury had issued an indictment. Further, the challenged error presents no basis for dismissal because there is no indication that the error was anything other than "'an isolated incident unmotivated by sinister ends.'" *United States v. Serubo*, 604 F.2d 807, 817 (3d Cir. 1979) (quoting *United States v. Birdman*, 602 F.2d 547, 559 (3d Cir. 1979)).

## V. CONCLUSION

For the foregoing reason, Defendant's motion to dismiss is denied. A separate Order will be filed simultaneously with this Memorandum Opinion.

Robert D. Mariani
United States District Judge