THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 3:20-CR-165 |
| | : | (JUDGE MARIANI) |
| LANCE GREEN, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION
### I. INTRODUCTION

Here the Court considers Defendant Lance Green's Motion for Judgment of Acquittal

and Motion for a New Trial (Doc. 95) filed on March 21, 2021.  Defendant filed this motion

following a four-day bifurcated trial which resulted in a guilty verdict on the two counts set

out in the Indictment filed on July 14, 2020, in which he was charged with a violation of 18

U.S.C. § 922(g), Prohibited Person in Possession of a Firearm, and a violation of 18 U.S.C.

§ 922(k), Possession of a Firearm with an Obliterated Serial Number.  (Doc. 1.)  On March

18, 2021, a jury found Defendant guilty of both counts.  (Docs. 87, 90.)

Defendant filed his brief in support of the pending motion on May 3, 2021.  (Doc.

105.)  The Government filed its opposition brief on August 16, 2021.  (Doc. 117.)  Defendant

did not file a reply brief and the time for doing so has passed.  Therefore, this matter is ripe

for disposition.  For the reasons discussed below, the Court will deny Defendant's motion.

## II. BACKGROUND

### A. Factual Background

On October 5, 2017, Sheila Rodriguez was living in a duplex at 141 Second Avenue, Kingston, in a first-floor apartment, with her children Noelle and Andre Peele.  (Doc. 100 at 42-43 (Trial Transcript ("T. Tr.") Day 2 42:1-43:13).)  Nasheena Curry was residing in the same duplex at 143 Second Avenue, Kingston, in the second-floor apartment.  (Doc. 101 at 3, 4 (T. Tr. Day 3 3:18-24, 4:17-18).)  On that morning, Curry got into a fight with Rodriguez and her children.  (*Id.* at 5 (T. Tr. Day 3 5:13-17).)  After the fight, Curry called her friend Nakirah Williams and the defendant, Lance Green, for help.  (*Id.* at 5, 6 (T. Tr. Day 3 5:21-25, 6:1-4).)  Curry then left the residence to pick up Williams and bring her back to the Second Avenue residence. (*Id.* at 7 (T. Tr. Day 3 7:13-17).)  Rodriguez called the police. (Doc. 100 at 44 (T. Tr. Day 2 44:6-12).)

Detective Robert Miller and Sergeant Sam Blaski from the Kingston Municipal Police Department responded to the call.  (Doc. 101 at 38 (T. Tr. Day3 8: 13-22).)  They arrived at the Second Avenue location at approximately 10:00 a.m. and spoke with Sheila Rodriguez, Noelle Peele, and Andre Peele.  (*Id.* at 39, 40 (T. Tr. 39:2-4, 40:5-6).)  Officers also made contact with Curry and questioned her about the incident.  (*Id.* at 7, 39 (T. Tr. Day 3 7:18-22, 39:20-21).)  Miller testified that, while at the scene interviewing Rodriguez and  her children,

2

a statement was made that Curry had said "Bring the strap," which means the gun.[1] (*Id.* at 49-50 (T. Tr. Day 3 49:23-50:6).)  After speaking with everyone, Officers decided to file charges through the mail and left the scene.  (*Id.* at 40 (T. Tr. Day 3 40:12-15).)

After Curry and Williams arrived at Curry's residence, Green arrived in a white car. (Doc. 101 at 7-8 (T. Tr. Day 3 7:11-8:10).)  Green, Williams and Curry then went downstairs and Green knocked on Rodriguez's door.  (*Id.* at 8 (T. Tr. Day 3 8:17-21).)  Andre Peele answered the door and shortly afterwards another fight broke out between the women.  (*Id.* at 9 (T. Tr. Day 3 9:10-15).)  At some point during the fight, Green pulled a gun out of his waistband and pointed it at Andre Peele.  (*Id.* at 9-10 (T. Tr.  Day 3 9:23-10:9).)  The fight ended and Curry, Williams and Green went back upstairs.  (*Id.* at 10 (T. Tr. Day 3 10:15-17).)

At approximately 10:30 a.m., Miller and Blaski were dispatched back to the scene after the second fight.  (Doc. 101 at 40 (T. Tr. Day 3 40:16-18).)  When they arrived back at

---

[1] Defendant's Statement of Facts contains the following introductory summary which does not provide citation to the record:

> On or about October 5, 2017, officers from the Kingston Municipal Police Department responded to a neighbor dispute at 141 Second Avenue, Kingston. Officers spoke to three residents at that residence who reported that during the dispute their female neighbor, Nasheena Curry, who resides at 143 Second Avenue, told someone over the phone "to bring the strap".

(Doc. 105 at 2.)  The averment that Curry's statement "to bring the strap" was stated "over the phone" is not contained in Miller's trial testimony.  This discrepancy will be discussed in Section IVD of this Memorandum Opinion.

the residence, Officers noticed a white vehicle in the driveway of 143 that was not there

previously.  (*Id.* (T. Tr. Day 3 40:19-25).) Officers spoke with Rodriguez and her children

and observed visible injuries on Noelle Peele.  (*Id.* at 41 (T. Tr. Day 3 41:1-10).)  They had

informed Officers that they were threatened with a firearm by the heavy-set black male.  (*Id.*

at 43, 44 (T. Tr. Day 3 43:4-8, 44:1-5).)  Officers attempted to speak with Curry and the

individuals in the upstairs apartment, but no one came to the door when they knocked.  (*Id.*

at 10, 41 (T. Tr. Day 3 10:18-24, 41:13-18).)  Officers decided to conduct surveillance.  (*Id.*

at 41-42 (T. Tr. Day 3 41:23, 42:2).)  At some point, Curry, Williams, and Green decided to

leave the upstairs apartment but, before doing so, Green took the gun out and lifted Curry

up to put the gun in the attic of her bedroom closet. (*Id.* at 10-11 (T. Tr. Day 3 10:25-11:22).)

While conducting surveillance, Blaski received another call for assistance, and he left

the area.  (Doc. 101 at 42 (T. Tr. Day 3 42:9-10).)  After Blaski left, Miller observed Curry

and another female and a male leave Curry's residence and get into the white car in the

driveway.  (*Id.* (T. Tr. Day 3 42:11-15).)  Miller began to follow the vehicle, driven by Curry,

until he felt it was safe to conduct a traffic stop.  (*Id.* (T. Tr. Day 3 42:23-25).) Due to a

firearm potentially being involved, Miller waited to initiate the traffic stop until he had

assistance from other officers. (*Id.* at 43 (T. Tr. 43:9-25).)  Once the car was detained, Curry

and her two passengers, who were identified as Williams and Green, were taken back to the

Kingston Police Department.  (*Id.* at 44 (T. Tr. Day 3 44:11-15).)

Initially Curry and Williams indicated that they did not know what the police were talking about and that nothing had happened but, later in the day, they provided statements as to what had happened.  (Doc. 101 at 45 (T. Tr. Day 3 45:9-17).)

After speaking with Curry and Williams, Officers obtained a search warrant for 143 Second Avenue.  (Doc. 101 at 46 (T. Tr. Day 3 46:2-).)  During the execution of the search warrant, ATF Special Agent Ryan Kovach located a firearm in a crawl space in the attic of Curry's apartment.  (*Id.* (T. Tr. Day 3 46:18-22).)  The firearm was seized as evidence and subsequently sent to the Pennsylvania State Police Lab for testing.  (*Id.* at 47 (T. Tr. Day 3 47:1-12).)

## B. Procedural Background[2]

The procedural background of this case begins with Defendant's arrest on October 5, 2017, by the Kingston Municipal Police Department which led to Pennsylvania state law charges and to his Indictment on January 23, 2018, by a federal grand jury for Prohibited Person in Possession of a Firearm, 18 U.S.C. § 922(g), and Possession of a Firearm with an Obliterated Serial Number, 18 U.S.C. § 922(k), under docket number 3:18-CR-21. Defendant was arraigned on these charges before Magistrate Judge Joseph F. Saporito on February 13, 2018, and pled not guilty to the charges in the Indictment.  Magistrate Judge

---

[2] The background information relating to 3:18-CR-21 and 3:19-CR-233 is derived from the Background section of the Court's Memorandum Opinion issued in 3:19-CR-233 regarding the Motion of Defendant, Lance Green, to Dismiss for Violation of the Speedy Trial Act and the United States Constitution (Doc. 34).  (3:19-CR-233 Doc. 50 at 1-8.) The summary therein contains citations to relevant records. However, the Court omits those citations from the recitation set out in the text.

Saporito appointed CJA Attorney Gino Bartolai, Esquire, to represent Defendant and ordered Defendant detained pending trial.

Also on February 13, 2018, District Judge A. Richard Caputo scheduled the matter for trial on April 23, 2018, and set March 13, 2018, as the deadline for filing pretrial motions and briefs.  On March 15, 2018, Judge Caputo granted Defendant's motion for an extension of time to file pretrial motions, extending the deadline to April 12, 2018.  On April 12, 2018, Judge Caputo granted Defendant's second motion for an extension of time to file pretrial motions, extending the deadline to May 14, 2018.  On May 14, 2018, Judge Caputo granted Defendant's third motion for an extension of time to file pretrial motions, extending the deadline to June 13, 2018.  No pretrial motions were filed prior before that deadline.

On September 26, 2018, Defendant filed a Motion for Leave to File Motion to Suppress Evidence Obtained as Result of Illegal Arrest Nunc Pro Tunc and on the same day filed the Motion to Suppress Evidence Obtained as a Result of Illegal Arrest.  Judge Caputo granted the Motion for Leave to File Motion to Suppress Evidence Obtained as Result of Illegal Arrest Nunc Pro Tunc on October 1, 2018.  By Memorandum and Order of November 28, 2018, Judge Caputo denied the motion to suppress.

On November 29, 2018, he set the matter for trial to commence on December 17, 2018.  On December 6, 2018, Defendant filed an unopposed motion to continue trial which Judge Caputo granted on December 13, 2018.  By Order of December 13, 2018, Judge Caputo set the trial for April 30, 2019.

Attorney Bartolai filed a Motion for New Counsel on January 20, 2019, and Judge Caputo appointed Enid Harris, Esquire, on January 29, 2019.  On February 21, 2019, Attorney Harris filed the Motion to Withdraw as Counsel Due to Conflict of Interest which Judge Caputo granted by Order of February 27, 2019.  On March 6, 2019, Joseph O'Brien, Esquire, was appointed to represent Defendant.

On April 18, 2019, Defendant filed a motion to continue the trial.  Judge Caputo granted the motion and set the trial for June 3, 2019.

On May 13, 2019, Defendant filed the Motion to Continue Trial and for Leave to File Motion to Dismiss for a Violation of the Speedy Trial Act which Judge Caputo granted by Order of May 14, 2019.  On June 3, 2019, Defendant filed a motion for extension of time to file his motion to dismiss which Judge Caputo granted on June 5, 2019, setting June 10, 2019, as the deadline for filing the motion.  Defendant filed the motion and supporting brief on June 10, 2019, and the Government filed its brief in opposition on June 21, 2019. Defendant filed a motion for an extension of time to file a reply which was granted, and Defendant filed his reply brief on July 15, 2019.  By Memorandum of July 19, 2019, Judge Caputo agreed that more than seventy non-excludable days elapsed from June 13, 2018, until September 26, 2018, in violation of the Speedy Trial Act, 18 U.S.C. 3161(c)(1).  He noted that the Government conceded that one hundred and thirty-three non-excludable days ran between Defendant's initial appearance and the filing of Defendant's Motion to Suppress on September 26, 2018.  Judge Caputo then considered the statutory factors set

7

out in 18 U.S.C. § 3161(c)(1) relevant to the determination of whether the Indictment should

be dismissed with or without prejudice and concluded that the factors weighed in favor of

dismissal without prejudice.  Therefore, by Order of July 19, 2019, Judge Caputo granted

the Motion to Dismiss the Indictment pursuant to the Speedy Trial Act and dismissed the

Indictment without prejudice.

On the same day as the dismissal of Indictment in 3:18-CR-21, the Government filed

a criminal complaint and charged Defendant with the same two offenses set out in the

Indictment (3:19-MJ-57 Doc. 1).  A grand jury indicted Defendant on July 30, 2019, and

Defendant had his initial appearance before Magistrate Judge Karoline Mehalchick on July

31, 2019, where he entered a plea of not guilty and was appointed CJA attorney Joseph

O'Brien, Esquire.  On motion of the Government attorney, Magistrate Judge Mehalchick

ordered Defendant detained pending trial.

On August 1, 2019, Judge Caputo issued a scheduling Order directing all pretrial

motions to be filed by August 20, 2019, and setting jury selection and trial for October 7,

2019.  On September 27, Defendant filed a motion to amend the scheduling Order and

requested an extension of time until October 21, 2019, to file pretrial motions. On October 2,

2019, Judge Caputo granted Defendant's request and indicated that a trial date would be

set after the expiration of the motion deadline.  On October 21, 2019, Defendant filed the

Motion to Suppress Evidence as a Result of Unconstitutional Search and Seizure and

supporting brief.  The government filed its response in opposition on October 29, 2019.  On

8

December 2, 2019, Judge Caputo issued a Memorandum Order denying Defendant's motion.

On December 4, 2019, the Government filed the Motion to Set Trial Date in which it indicated that "[t]he Speedy Trial time expires on December 13, 2019" and requested the Court to schedule a trial immediately.  On December 18, 2019, at the request of the government, Judge Caputo held a conference call with counsel for the Government and counsel for Defendant regarding the Government's Motion to Set Trial Date.  On the same day, the case was reassigned to the undersigned for all further proceedings by verbal order.

On December 19, 2019, both parties participated in a conference call with this Court. Defense counsel indicated that, by the end of the year, he would be filing a motion to dismiss based on a Speedy Trial Act violation.  Government counsel reports that she contacted Defendant's counsel on January 3, 2020, because no motion had been filed and he indicated that his client no longer wanted a motion to dismiss filed.  Government counsel also reports that she again spoke with Defendant's counsel on January 6, 2020, and he again stated Defendant did not want the motion filed.  On the same day, Government counsel notified the Court that no motions would be filed.

The Court issued an Order on January 6, 2020, setting the case for trial on January 22, 2020.

Defendant's counsel subsequently requested a telephone conference which the Court scheduled by Order of January 13, 2020, for January 14, 2020.  At the telephone

conference, Defendant's counsel informed the Court that Defendant wanted to file a Speedy

Trial Act motion and move for DNA related discovery.  Defendant filed his Speedy Trial Act

motion on January 21, 2020.  On January 22, 2020, the Court continued the trial, to be

rescheduled if necessary following resolution of Defendant's motion.  After the motion was

fully briefed, the Court set a hearing for June 24, 2020.

On April 3, 2020, Defendant filed the Motion of Defendant, Lance Green, for

Reconsideration of Detention Order seeking his release under 18 U.S.C. § 3142(i) for

reasons related to the COVID-19 pandemic and the preparation of Defendant's defense.

This motion was referred to Magistrate Judge Mehalchick who denied it by Memorandum

and Order of April 30, 2020.

On June 18, 2020, Defendant filed the Motion of Defendant, Lance Green, for

Pretrial Release.  He stated that the basis for his motion was the same as that set out in his

April 3, 2020, motion and relevant briefing.  He also asked that the Court allow him to

address the issue at the June 24, 2020, hearing.

At the hearing held on June 24, 2020, the Court heard argument on both the speedy

trial and release motions.  On June 25, 2020, the Court issued the Order Setting Conditions

of Release with which the Court ordered that Defendant be released on personal

recognizance subject to numerous specific conditions.

On July 9, 2020, the Court granted Defendant's Motion to Dismiss for Violation of the

Speedy Trial act and the United States Constitution in part and denied it in part.  The motion

10

was granted insofar as the Court concluded that the Speedy Trial Act was violated and the motion was denied insofar as the dismissal was without prejudice.

Pertaining to the above-captioned matter, on July 15, 2020, a grand jury again indicted Green with Prohibited Person in Possession of a Firearm and Possession of a Firearm with Obliterated Serial Number. (Doc. 1.)  A summons was issued and Magistrate Judge Mehalchick held Green's initial appearance.  (Docs. 8, 10.)  Magistrate Judge Mehalchick continued Green's pretrial release with no objection from the Government.

On August 17, 2020, Green was arrested for a state probation violation and incarcerated in the Lackawanna County Prison ("LCP").  During the initial search at the LCP, officers discovered a bag of suspected marijuana in his genitals and a bag of suspected cocaine in his buttocks.  On August 27, 2020, Lackawanna County Detectives filed a criminal complaint against Green for the contraband found during the search. (Magisterial District Number 45-1-06, CR 357-20.)

Green filed pretrial motions to suppress evidence and this Court held a hearing on November 23, 2020.  (Docs. 17 and 18.)  Also on November 23, 2020, the Government filed a motion to revoke Green's pretrial release due to the new arrest.  (Doc. 28.)  Magistrate Judge Mehalchick granted the government's motion and revoked Green's pretrial release. (Doc. 38.)

On January 8, 2021, this Court denied Green's pretrial motions and scheduled trial to commence March 15, 2021. (Docs. 42-44.)

On March 18, 2021, following a bifurcated jury trial, Green was convicted on all

charges contained in the indictment.  (Docs. 87 and 90.)

Green filed the current motion for Judgment of Acquittal and New Trial (Doc. 95) on

March 31, 2021.  Defendant's sentencing is currently pending.

### III. STANDARD OF REVIEW

A defendant may move for a judgment of acquittal pursuant to Federal Rule of

Criminal Procedure 29.  Where "the jury has returned a guilty verdict, the court may set

aside the verdict and enter an acquittal."  Fed. R. Crim. P. 29(c)(2).

> In ruling on a motion for judgment of acquittal made pursuant to Fed. R. Crim.
> P. 29, a district court must "'review the record in the light most favorable to
> the prosecution to determine whether any rational trier of fact could have
> found proof of guilty [sic] beyond a reasonable doubt based on the available
> evidence.'" *United States v. Smith,* 294 F.3d 473, 476 (3d Cir. 2002) (quoting
> *United States v. Wolfe,* 245 F.3d 257, 262 (3d Cir. 2001)). A finding of
> insufficiency should be "'confined to cases where the prosecution's failure is
> clear.'" *Smith,* 294 F.3d at 477 (quoting *United States v. Leon,* 739 F.2d 885,
> 891 (3d Cir. 1984)). Courts must be ever vigilant in the context of Fed. R.
> Crim. P. 29 not to usurp the role of the jury by weighing credibility and
> assigning weight to the evidence, or by substituting its judgment for that of the
> jury. *See United States v. Jannotti,* 673 F.2d 578, 581 (3d Cir.) (en banc) (trial
> court usurped jury function by deciding contested issues of fact), *cert. denied,*
> 457 U.S. 1106, 102 S. Ct. 2906, 73 L.Ed.2d 1315 (1982); *see also* 2A Charles
> A. Wright, FED. PRAC. & PRO. (Criminal 3d) § 467 at 311 (2000) ("A number
> of familiar rules circumscribe the court in determining whether the evidence is
> sufficient ... It is not for the court to assess the credibility of witnesses, weigh
> the evidence or draw inferences of fact from the evidence. These are
> functions of the jury.").

*United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).  The Third Circuit has long advised

that, in considering a post-verdict judgment of acquittal, the court "must uphold the jury's

verdict unless no reasonable juror could accept the evidence as sufficient to support the

defendant's guilt beyond a reasonable doubt." *United States v. Fattah*, 914 F.3d 112, 183

(3d Cir. 2019) (citing *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)). In *United*

*States v. Tyler*, the Third Circuit again recently reiterated the well-recognized standard:

> This review is "highly deferential" to the factual findings of the jury, and we "must be ever vigilant ... not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (alteration and omission in original) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

> Thus, even if the evidence adduced is consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict ... as long as it passes the bare rationality test. Reversing the jury's conclusion simply because another inference is possible – or even equally plausible – is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, which is that [t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt. It is up to the jury – not the district court judge or our Court – to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld.

> *Id.* at 433 (alteration in original) (internal quotation marks and citation omitted).

956 F.3d 116, 122-123 (3d Cir. 2020).

A defendant may also move for a new trial pursuant to Federal Rule of Criminal

Procedure 33. Rule 33 provides in pertinent part that "[u]pon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice so requires. . ."

Fed. R. Crim. P. 33(a).

"Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir. 2002). However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* (citation and quotation marks omitted). . . . Such motions are not favored and should be "granted sparingly and only in exceptional cases." *Gov't of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted).

*United States v. Silveus*, 542 F.3d 993, 1004-1005 (3d Cir. 2008). "The discretion that federal trial courts exercise in addressing allegations of juror and prosecutorial misconduct extends to the determination of whether prejudice has been demonstrated." *United States v. Smith*, 139 F.App'x 475, 477 (3d Cir. 2005) (citing *United States v. Resko,* 3 F.3d 684, 690 (3d Cir. 1993)). Where a defendant alleges that the cumulative effect of trial errors resulted in an unfair trial, a new trial is required "only when 'the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quoting *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992)).

## IV. ANALYSIS

As set out above, Defendant Lance Green's Motion for Judgment of Acquittal and Motion for a New Trial (Doc. 95) was filed on March 21, 2021. He raises six issues in his motion and the Court will address each in turn.

A.   **Denial of Defendant's Motion for Judgment of Acquittal on Count II of the Indictment**

Defendant first asserts that the Court erred when it denied his motion for judgment of acquittal on Count II made at the close of the Government's case in chief.  (Doc. 105 at 5.) At that time, Defendant's counsel, Joseph O'Brien, made the argument he puts forth here: the Government's presentation of the testimony of trained firearms experts regarding observations derived from their forensic investigation of the gun is not enough to produce an inference that Defendant knew that the serial number was obliterated and the obliterated serial number plate is on the underside of the barrel and not readily visible.  (*See* Doc. 102 at 5 (T. Tr. Day 4 5:2-13), Doc. 105 at 6-7.)  The Government responds, as Government's counsel, Assistant United States Attorney ("AUSA") Jenny Roberts, did at trial, that circumstantial evidence, including the firearm itself and photographs of the firearm, was sufficient evidence: it was clear that the frame of the firearm is black and the serial plate silver and the appearance of the plate and gouges and scratches on the gun were clearly visible and extended to the black frame.  (*See* Doc. 102 at 4, 6 (T. Tr. Day 4 4: 9-18, 6:3-14), Doc. 117 at 17.)

Following counsels' arguments at trial, the Court concluded that the Government had presented sufficient evidence regarding Defendant's knowledge that the gun had an obliterated serial number for the case to go to the jury.  (Doc. 102 at 8 (T. Tr. Day 4 8:8-15).)

The jury was instructed at the close of the case that, as an element of the Possession of a Firearm with an Obliterated Serial Number charge, they had to

unanimously find beyond a reasonable doubt that "Lance Green knew that the serial number had been removed, obliterated, or altered.  However, the government is not required to prove that Lance Green removed, obliterated or altered the serial number." (Doc. 85 at 16.)  Their return of a guilty verdict on this charge indicates that the jury unanimously found beyond a reasonable doubt that Green knew that he possessed a firearm with an obliterated serial number.

As set out above, the court "must uphold the jury's verdict unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt." *Fattah*, 914 F.3d at 183.  At trial, the Court concluded that the Government had produced sufficient evidence for a reasonable juror to find that Defendant knew the serial number on the gun had been obliterated.  (Doc. 102 at 8 (T. Tr. Day 4 8:8-15).)  Defendant presents no basis to support a different conclusion with his pending motion.  Therefore, the Court will deny Defendant's pending motion for judgment of acquittal on Count II.

## B. *Speedy Trial* Act Violation

Defendant contends that the Court erred when it dismissed Counts I and II of the indictment in Case Number 3:19-CR-233 without prejudice after Defendant filed the Motion of Defendant, Lance Green, to Dismiss for Violation of the Speedy Trial Act and the United States Constitution (3:19-CR-233 Doc. 34).  (Doc. 105 at 7.)  The Court issued the Memorandum Opinion and Order addressing this motion on July 9, 2020.  (3:19-CR-233 Docs. 50, 51.)  As set out in the Memorandum Opinion, the Court considered the requisite

factors pursuant to 18 U.S.C. § 3162(a)(2): the (1) the seriousness of the offense; (2) the

facts and circumstances of the case which led to the dismissal; and (3) the impact of a

reprosecution.  (3:19-CR-233 Doc. 50 at 12.)  In his current filing, Defendant takes issue

with the Court's determination that the second and third factors weighed in favor of

dismissal without prejudice.  (Doc. 105 at 9-11.)

   With this argument, Defendant seeks reconsideration of the Court's decision in the

case that was closed on July 9, 2020.  Defendant did not seek reconsideration before the

March 31, 2021, filing under consideration here (Doc. 95) in support of which Defendant

filed a supporting brief (Doc 105) on May 3, 2021, nor did Defendant appeal the Court's

disposition of 3:19-CR-233.  Given this procedural posture, Defendant does not complain of

any decision made by the Court in this case or any matter related to the trial or jury verdict.

Rather, he seeks reconsideration of a decision made in another case.

   While there is no Federal Rule of Criminal Procedure specifically authorizing motions

for reconsideration, "it is settled that 'Motions for reconsideration may be filed in criminal

cases.'"  *United States v. Fiorelli*, 337 F.3d 282, 286 (3d Cir. 2003).  The law relied upon by

the Court of Appeals and district courts in the Third Circuit deciding these motions in

criminal cases comes from the civil sphere.  *See*, *e.g.*, *United States v. Gilliam*, Cr. No.

3:17-CR-258, 2020 WL 5505944, at *1 (M.D. Pa. Sept. 11, 2020).  The Local Rules of Court

of the Middle District of Pennsylvania, which apply to both civil and criminal cases, *see* L.R.

1.1, specifically provide that "any motion for reconsideration . . . must be accompanied by a supporting brief and filed within fourteen (14) days after the entry concerned," L.R. 7.10.

In the civil sphere, it is well recognized that the purpose of a motion for reconsideration is "to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Café v. Quinteros,* 176 F.3d 669, 677 (3d Cir. 1999). Accordingly, the party seeking reconsideration must show at least one of the following grounds: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Id.* (citing *North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir. 1995)). Moreover, "motions for reconsideration should not be used to put forward arguments which the movant ... could have made but neglected to make before judgment." *United States v. Jasin*, 292 F. Supp. 2d 670, 677 (E.D. Pa. 2003) (internal quotation marks and alterations omitted) (quoting *Reich v. Compton*, 834 F. Supp. 2d 753, 755 (E.D. Pa. 1993) *rev'd in part and aff'd in part on other grounds*, 57 F.3d 270 (3d Cir. 1995)). Nor should they "be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant." *Donegan v. Livingston*, 377 F. Supp. 2d 212, 226 (M.D. Pa. 2012) (quoting *Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 606 (M.D. Pa. 2002)).

Whether from a procedural or substantive perspective, Defendant presents no basis to reconsider the Court's disposition of the case which preceded this action. Procedurally, he presents no authority which suggests that a motion filed in this action can alter the disposition of the preceding action. Even if he had done so, Defendant did not seek reconsideration within the fourteen days required by Local Rule 7.10.

Assuming *arguendo* that Defendant's current request is procedurally feasible, Defendant's argument is without substantive merit in that he merely reargues matters previously decided after full briefing. (*See* 3:19-CR-233 Docs.36-38.) In the detailed Memorandum Opinion addressing Speedy Trial Act and Sixth Amendment issues, the Court addressed Defendant's arguments and determined that the relevant factors weighed in favor of dismissal without prejudice. (*See* 3:19-CR-233 Doc. 50.)

As to the second factor now disputed-- the facts and circumstances of the case which led to the dismissal, 18 U.S.C. § 3162(a)(2)--Defendant does not raise any new facts or circumstances regarding dismissal which would warrant a conclusion differing from that set out in the Court's Memorandum Opinion and Order of July 9, 2020 (3:19-CR-233 Docs. 50, 51). (*See* Doc. 105 at 9-10.)

As to the third factor--the impact of reprosecution on the administration of this chapter and the administration of justice, 18 U.S.C. § 3162(a)(2)--Defendant posits that "[t]he impact of reprosecution remains clear[,] Green remains incarcerated for an excessive

amount of time." (Doc. 105 at 10.)  This assertion is disingenuous at best and distressingly, if not deliberately, inaccurate.

While the Motion of Defendant, Lance Green, to Dismiss for Violation of the Speedy Trial Act and the United States Constitution (3:19-CR-233 Doc. 34) was pending, Defendant filed the Motion of Defendant, Lance Green, for Pretrial Release (3:19-CR-233 Doc. 46). On June 25, 2020, the Court issued the Order Setting Conditions of Release and released Defendant on his own recognizance. (3:19-CR-233 Doc. 48.)  When the case was closed on July 9, 2020, (see 3:19-CR-233 Doc. 51), Defendant was **not** incarcerated.  Following arraignment in the above-captioned matter on July 22, 2020, before Magistrate Judge Mehalchick, Defendant remained free on conditional release. (See Doc. 11.)

On November 23, 2020, the Government filed the Motion of the United States for Revocation of Pretrial Release and a Warrant of Arrest (Doc. 28) wherein AUSA Roberts stated that

> [o]n November 19, 2020, the undersigned Assistant United States Attorney received a violation report from Federal Probation. The report indicates that on August 17, 2020, Green was arrested for a state parole violation and then subsequently charged by the Lackawanna District Attorney's Office for drug possession and trafficking violations. The report also indicates that on September 1, 2020, while incarcerated at the Lackawanna County Prison for the above referenced allegations Green had a misconduct violation.
>
> In light of Green's failure to comply with the conditions of pretrial services, it is requested that a warrant be issued and that Green's pretrial release be revoked.

(Doc. 28 at 1-2.)

20

Thus, the record is clear that Defendant was not reincarcerated because a new indictment was filed.  Rather, he remained free on conditional release until he violated his state parole and was charged with new state court infractions.  In these circumstances, the "impact of reincarceration" cannot be considered a factor that weighs in Defendant's favor.

For the foregoing reasons, Defendant is not entitled to relief related to the Court's previous Speedy Trial Act determination.

## C.  Sixth Amendment Violation

Defendant's claim regarding the Court's previous decision concerning a Sixth Amendment violation fails procedurally and substantively for basically the same reasons as those discussed in the previous section of this Memorandum Opinion.  The Court considered Defendant's Sixth Amendment claim in the Memorandum Opinion issued on July 9, 2020, in case number 3:19-CR-233 and determined that the relevant factors weighed in favor of dismissal without prejudice (3:19-CR-233 Doc. 50 at 24-45): Defendant complains of a decision made in a previous case and he presents no procedural or substantive basis for this Court to grant relief (see Doc. 105 at 11-14).  Like his Speedy Trial Act claim, Defendant's Sixth Amendment claim does not entitle him to relief.

## D.  Motion for Mistrial

Defendant next contends that the Court erred in denying his motion for a mistrial based on a statement made in the Government's closing argument.  (Doc. 105 at 14.)  The Government responds that the Court properly denied Defendant's motion.  (Doc. 117 at 29.)

Defendant's counsel lodged an objection during the Government's closing argument and asked for a mistrial based on AUSA Roberts' reference to a statement as having been made on the telephone by Nasheena Curry when no evidence had been introduced that the statement, referenced by Detective Miller during his testimony, mentioned a telephone. (Doc. 102 at 40-41 (T. Tr. Day 4 40:17-41:18).)  To give the statement related to Miller context, the Court sets out a relevant portion of the transcript.

> Ladies and gentlemen, the Government must prove its case to you beyond a reasonable doubt, not beyond all doubt, not doubt to some type of mathematical certainty, not beyond a shadow of a doubt, a reasonable doubt.
>
> So is it reasonable to believe that Sheila Rodriguez got up on the stand and lied? Is it reasonable to believe that? She clearly did not like her neighbor Nasheena Curry, her upstairs neighbor. If she was going to say that someone had a gun and she was going to place blame on someone, just because she didn't like them, it would be Nasheena. If she was out to get somebody in trouble, it wasn't going to be the individual that she never met before, when the police arrived, it was going to be Nasheena, her upstairs neighbor who attacked her daughter, who was fighting with her, who she called 911 about. But she didn't say Nasheena had the gun and pointed it and threatened us, she said, the man with Nasheena had the gun.
>
> Do you remember her demeanor on the stand when she testified? Did it look like she was vengeful or did it look like she was fearful of actually saying what happened?
>
> Is it reasonable to believe that Nasheena Curry is lying?  Don't forget, she admitted on the witness stand that she called Lance Green and she called her friend Nakira for help to fight her downstairs neighbors. She called them for help.
>
> Don't forget, as well, that Detective Miller testified that, when he interviewed Sheila Rodriguez, she said Nasheena Curry was talking to someone **on the phone**, which corroborates—

MR. O'BRIEN: Your Honor, I'm going to object. Could I have a sidebar?

THE COURT: Sure.

(At this time a discussion was held on the record at sidebar.)

MR. O'BRIEN: I don't like objecting during a closing, and I apologize for doing it, but counsel just hit, I think, on one of the most important things in the case. I don't think Miller's report says that Rodriguez told him that Nasheena was talking on the phone, yelling, Get the strap. That's not what he testified, not my recollection. I asked him a question, he said she was yelling it, he didn't say, the phone, and that is a crucial element in this case, because the absence of the phone, it takes away -- my argument is that it was Nasheena's gun, she was yelling to somebody, Bring down the gun.

　　　It's in Miller's report, I don't think it was in his testimony, and I think that that's a crucial element of this case, which I don't think was proven.

　　　. . . [I]f she has brought in evidence outside the record that, in my opinion, goes after one of my key defenses, my most important argument, I think, a mistrial is required.

(Doc. 102 at 39-41 (T. Tr. Day 4 39:19-41:18) (emphasis added).)

　　　In the follow-up discussion, Defendant's counsel explained that "from the moment I questioned Miller and he said she was yelling, Get the strap, and he didn't mention a telephone, I think, that's the most strongest evidence we have, because I think it tends to show that the gun was Nasheena's and not my client's." (Doc. 102 at 42 (T. Tr. Day 4 42:9-13).) He added that by bringing out the telephone on closing argument, the AUSA "arguing that [Nasheena Curry] was asking someone to bring the strap on the phone, that changes the whole thing. . . . I don't think [Miller] mentioned the phone." (*Id.* (T. Tr. Day 4 42:15-19).)

Defendant's counsel also definitively stated that "the fact that [Nasheena Curry] was yelling into a phone is not in the evidence." (*Id.* at 43 (T. Tr. Day 4 43:16-17).)

The Court Reporter then read back the relevant portion of Defendant's counsel's cross-examination of Miller:

> THE REPORTER: "QUESTION: Okay. Now, when you went there the first time, you interviewed Andre Piel, Sheila Rodriguez and Noel Piel; right?"
>
> "ANSWER: Yes, sir."
>
> "QUESTION: You talked to them. Was a statement made that Nasheena Curry had said, Bring the strap?"
>
> "ANSWER: Yes."
>
> "QUESTION: Okay, now, in your parlance, police parlance, the strap means the gun?"
>
> "ANSWER: Yes, sir."

(Doc. 102 at 43-44 (T. Tr. Day 4 43:25-44:8).)

The Court noted that there was "clearly testimony that she called the defendant . . . [but] there isn't a direct connection that it was said on the telephone." (*Id.* at 45 (T. Tr. Day 4 45:17-21).) The Court then denied Defendant's motion. (*Id.* at 46 (T. Tr. Day 4 46:18).)

In *United States v. Young,* 470 U.S. 1 (1985), the Supreme Court stated that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Id.*

at 11. The Third Circuit explained the appropriate inquiry in *United States v. Brown*, 765

F.3d 278 (3d Cir. 2014).

> Improper statements made during summation may warrant a new trial when
> such statements "cause[ ] the defendant substantial prejudice by so infecting
> the trial with unfairness as to make the resulting conviction a denial of due
> process." *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir.1999) (internal
> quotation marks and citations omitted). Our first task is to determine whether
> the prosecutor's comments were improper. *United States v. Mastrangelo,* 172
> F.3d 288, 297 (3d Cir.1999). "If we conclude that a comment was improper, we
> must apply a harmless error analysis, looking to see if 'it is *highly probable* that
> the error did not contribute to the judgment.' " *Id.* (quoting *United States v.
> Zehrbach,* 47 F.3d 1252, 1265 (3d Cir.1995) (en banc)).

*Brown*, 765 F.3d at 296. *Brown* quoted *United States v. Gray,* 876 F.2d 1411, 1417 (9th

Cir.1989), for the proposition that "[I]t is improper to base closing arguments upon evidence

not in the record," and Charles Alan Wright *et al, Federal Practice and Procedure* § 588 (4th

ed.2011), for the proposition that "[i]t is misconduct for a prosecutor to make an assertion to

the jury of a fact, either by way of argument or by an assumption in a question, unless there

is evidence of that fact." *Brown*, 765 F.3d at 296.

In the statement at issue, Roberts said that "Detective Miller testified that, when he

interviewed Sheila Rodriguez, she said Nasheena Curry was talking to someone on the

phone, which corroborates." (Doc. 102 at 40 (T. Tr Day 3 40:17-19).) The only

objectionable words are "on the phone." *See supra* pp. 23-24. A review of Miller's

testimony shows that he did not mention anything about a phone in connection with the

information he received that Curry had been heard to say "bring the strap" after the first

altercation. *See supra* p. 24. Therefore, Roberts made an assertion of fact to the jury which

was not supported by evidence of record and the Court must determine whether the error,

i.e., the addition of the words "on the phone," was harmless. *Brown*, 765 F.3d at 296.

> As stated in *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995),

> [t]he harmless error doctrine requires that the court consider an error in light of the record as a whole, but the standard of review in determining whether an error is harmless depends on whether the error was constitutional or non-constitutional. In this instance, the alleged error, attacking the credibility of a witness with evidence not in the record, is non-constitutional. We have held that non-constitutional error is harmless when "it is *highly probable* that the error did not contribute to the judgment." *Government of Virgin Islands v. Toto,* 529 F.2d 278, 284 (3d Cir.1976). "High probability" requires that the court possess a "sure conviction that the error did not prejudice" the defendant. *United States v. Jannotti,* 729 F.2d 213, 219-20 (3d Cir.), *cert. denied,* 469 U.S. 880, 105 S.Ct. 243, 244, 83 L.Ed.2d 182 (1984).

*Zehrbach*, 47 F.3d at 1265.

> In making the determination, a court should consider

> whether the prosecutor's remarks, taken in the context of the trial as a whole, prejudiced the defendants.

> In determining prejudice, we consider the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction. As the Supreme Court has emphasized "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context." *United States v. Young,* [470 U.S. 1, 11 (1985)] (finding harmless error where the prosecutor had stated his opinion that the defendant was guilty and urged the jury to "do its job").

*Zehrbach*, 47 F.3d at 1265. The extent of misleading comments is a relevant consideration

in the determination of prejudice. *See United States v. Boyd*, 999 F.3d 171, 184 (3d Cir.

2021) (noting prosecutor's improper comments made up only small fraction of closing

argument; quoting *Zehrbach*'s notation that "the comments at issue were but two sentences in a closing argument that filled forty pages of transcript," 47 F.3d at 1267). *Boyd* also found it relevant that the court's final instructions to the jury made clear that that statements and arguments by the lawyers were not evidence. *Id.* at 184-85.

Here, the misinformation, viewed in context, does not give rise to harmful error. Before her misstatement about the telephone, Roberts had pointed to Sheila Rodriguez's testimony that the man with Curry had the gun and Curry had testified that she had called Defendant and Nakirah Williams for help to fight her downstairs neighbors. *See supra* pp. 22-23. Roberts' statements concerning Curry and Williams are supported by the record. *See supra* pp. 2-4. Notably, Roberts' statement did not mention Defendant by name or reference and did not mention a strap or a gun. Roberts did not finish her statement or add any information connecting Defendant with a gun based on Miller's testimony before the objection was raised and the motion for a mistrial was decided.

Defendant now asserts that the basis for the objection at trial was that

Miller did not testify that Curry had called Green on the phone and asked him to bring the strap as the United States Attorney implied. Rather, Miller testified only that Curry asked for a firearm during the first fight (Transcript March 17, 2021, [Doc. 101] at 49), at which time Green was not onsite, and could not have been the person to whom she made that request.

(Doc. 105 at 16.)

This assertion does not point to prejudice because it is fundamentally flawed: the testimony that Curry was heard to say "bring the strap" does not indicate that the statement

was made to someone onsite. First, no evidence suggested that anyone at the scene was affiliated with Curry before the arrival of Williams and Green. Thus, it would be difficult for jurors to infer that Curry had said "bring the strap" to an individual onsite who had never been mentioned or alluded to at the trial. It would also be an unrealistic and illogical stretch for jurors to infer that Curry was talking to herself in that she testified that she called Williams and Green for help because of the first altercation. *See supra* p. 2. That leaves the inference that Curry made the statement "bring the strap" to someone whom she called for help, i.e., that she called someone "on the phone." Because evidence was introduced and unrefuted that Curry called Defendant and Nakirah Williams for help (Doc. 101 at 5-6 (T. Tr. Day 3 5:18-6:25)), that both individuals participated in the second altercation (*id*. at 7-10 (T. Tr. Day 3 7:18-10:14)), and Defendant was the only individual who displayed a firearm during the altercation (*id*. at 9-10 (T. Tr. Day 3 9:23-10:12); *see also id.* at 28-29 (T. Tr. Day 3 28:20-29:14)), jurors could easily have concluded, without Roberts' comment, that the most reasonable inference was that Curry asked over the telephone for someone else to "bring the strap" and that "someone" was Lance Green.

As posited by the Government, the following testimony shows that "the finding of guilty did not hang on any suggestion made during closing argument but was firmly and overwhelmingly grounded in the evidence presented during the course of trial." (Doc. 117 at 32.)

> Shelia Rodriguez testified that the man with her upstairs neighbor had a handgun in his waistband that he removed. T.T., March 16, 2021, pg. 46, lines

28

> 1-22. Nasheena Curry and Nakira Williams both testified that Green had the gun. T.T., March 17, 2021, pg. 9, line 23 to pg. 10, line 12 and pg. 29, lines 6-13. Further, both the government DNA expert and Green's DNA expert both linked Green's DNA to the DNA found on the gun. Id. at 138, 17 to pg. 141, line 9 and T.T., March 8, 2021, pg. 33, line 21 to pg. 34, line 8.

(Doc. 117 at 31-32.)

Defendant also asserts that Roberts' statement substantially prejudiced the defense

strategy:

> The comments which were the subject of Defendant's motion for mistrial were clearly improper, as the evidence contains absolutely no record that Detective Miller testified that Curry called Green on a cell phone during the first fight and requested that he bring the strap, which was the clear implication of her comments. Green submits that said statements substantially prejudice his position, as they were aimed directly at his prime defense strategy, i.e., the credibility of Nasheena Curry. If the jury had not heard those comments, and had concluded that the firearm belonged to Nasheena Curry, it is only logical to assume that they would have concluded that she was not telling the truth and discarded her testimony.

(Doc. 105 at 17.)

Based on the evidence discussed above, the weak link in Defendant's argument is

that Roberts' closing argument comment stood in the way of the jury believing that the

firearm belonged to Curry where the record shows that corroborated evidence related the

gun to Defendant.  In his supporting brief, Defendant's strategy of undermining Curry's

credibility is otherwise supported only by the assertion that "[p]olice investigative records

indicated that the testimony of Williams and Curry was inconsistent with statements they

had given to police earlier that day." (Doc. 105 at 18 (citing Doc. 101 at 45 (T. Tr. Day 3)).)

The cited transcript contains the following exchange between Roberts and Miller:

Q. Did Nasheena Curry, initially, tell you what happened?

A. She did not. The best way I can explain it is, as soon as we stopped the vehicle, I personally spoke with each one of the occupants -- well, each one of the females. I advised them of their Miranda rights, their Constitutional rights, that they didn't have to speak to me. They agreed to speak with me, however, both of them immediately -- both of them being Nasheena Curry and Nakirah Williams -- both of them, basically, told me, I don't know what you're talking about, nothing happened.

Q. And at some point later on that day, did both Nasheena Curry and Nakirah Williams provide statements as to what happened?

A. They did.

(Doc. 101 at 45 (T. Tr. Day 3 45:4-17).)

Objectively assessed, the cited testimony describes individuals who quickly decided to abandon their know-nothing strategy.  Beyond that, the evidence does not show that either Curry or Williams told factually different stories or provided testimony contrary to statements previously given regarding the occurrences of October 5, 2018.

Finally, as found relevant in *Boyd*, 999 F.3d at 184-85, here the Court instructed the jury at the beginning and end of the trial that "statements and arguments of the lawyers for the parties are not evidence."  (Doc. 85 at 4; Doc. 100 at 24 (T. Tr. Day 2 24:14-15.)  In the preliminary instructions, the Court also explained to the jury that

> after all of the evidence has been presented, the lawyers will have the opportunity to present closing arguments. Closing arguments are designed to present to you the parties' theories about what the evidence has shown and what conclusions may be drawn from the evidence. What is said in closing arguments is not evidence, just as what was said in the opening statements is not evidence.

(Doc. 100 at 23 (T. Tr. Day 2 23:6-12).)

In sum, both the extent and the substance of Roberts' closing argument comment, viewed in the context of the whole trial and the Court's instructions to the jury, do not show that the error prejudiced the defense. Thus, applying harmless error analysis, the Court finds that "it is highly probable that the error did not contribute to the judgment," *Zehrbach*, 47 F.3d at 1265.[3]

---

[3] The defense strategy's reliance on Miller's statement wherein he did not mention he was told that the "bring the strap" comment occurred during a phone call made by Curry is questionable in that the absence of any reference to a phone call in Miller's trial testimony appears to be an inadvertent omission which occurred on the third day of trial. Defendant's counsel admitted at sidebar during trial that the information concerning the phone had been in Miller's report. (Doc. 102 at 41 (T. Tr. 41:10).) Further, as previously set out in the margin, *see supra* p. 3 n.1, Defendant's "Statement of Facts" section of his brief supporting this motion contains the following introductory summary which does not provide citation to the record:

> On or about October 5, 2017, officers from the Kingston Municipal Police Department responded to a neighbor dispute at 141 Second Avenue, Kingston. Officers spoke to three residents at that residence who reported that during the dispute their female neighbor, Nasheena Curry, who resides at 143 Second Avenue, told someone over the phone "to bring the strap".

(Doc. 105 at 2.)

As discussed in the text, the averment that Curry's statement "to bring the strap" was stated "over the phone" is not contained in Miller's trial testimony. However, Miller testified at the Suppression Hearing held on November 23, 2020, where he provided more information than he did at trial:

> Q. Did Ms. Piel or any other resident at 141 bring to your attention anything that was said during that altercation?
>
> A. Yes. Prior to our arrival, our being the police department, Ms. Curry was heard outside on the sidewalk by both Piel and Ms. Rodriguez yelling to someone on the phone to, bring the strap. I'm familiar with street terminology for strap being a firearm.

(Doc. 34 at 7 (Hr'g Tr. 7:6-12).) This testimony is consistent with Miller's statement in the October 5, 2017, Incident Report wherein Miller stated that, during the initial altercation, he "was advised that CURRY was

## D. Expert Testimony

Defendant maintains that the Court erred when it admitted the testimony of Ut N. Dinh, the Government's expert witness who testified about the likelihood that the DNA found on the firearm was Defendant's. (Doc. 105 at 18-19.) Defendant specifically takes issue with the Court's allowance of Dinh's testimony that it "was 60 trillion times more likely that the DNA found on the firearm originated from Defendant, rather than an unknown, unrelated African America individual." (Doc. 105 at 19.) The Government responds that the Court correctly allowed Dinh's testimony regarding the statistical likelihood that the DNA found on the firearm belonged to Defendant. (Doc. 117 at 33-40.)

Rule 702 of the Federal Rules of Evidence provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

---

outside on the telephone yelling for someone to 'bring the strap' and the [redaction] felt that this was CURRY calling for someone to bring a gun." (Doc. 40-1 at 4.)

Because the Court is directed to look at "whether the prosecutor's remarks, taken in the context of the trial as a whole, prejudiced the defendant[]," *Zehrbach*, 47 F.3d at 1265, what was said about "bring the strap" outside the context of trial is not relevant to whether the Court correctly denied Defendant's motion for a new trial raised during the Government's closing argument. However, Defendant's claim of prejudice and erosion of his trial strategy is somewhat undermined when Miller's omission ostensibly played a significant role in Defendant's strategy, *see supra* pp. 23-24, yet counsel knew that the omission was not consistent with Miller's prior statements and police documents.

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Third Circuit Court of appeals has explained that

Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. [*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 711, 741-443 (3d Cir. 1994) ("*Paoli* II")],  (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." *Id*. Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his on her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." *Paoli II,* 35 F.3d at 742 (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786). Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." 509 U.S. at 591–92, 113 S.Ct. 2786.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003).

Defendant asserts that

Ut N. Dinh, the Government's DNA expert, was unable to testify as to whether the likelihood formula she had used to produce the testimony had been tested, or had been subject to peer review. She also did not offer any testimony as to its potential rate of error. All she could say was that it was a formula she used and could be done either through a computer or by hand. She offered no testimony as to the source of the formula, or how it was developed.

Based on the above, the Defendant submits that the United States did not establish that the testimony on statistical likelihood was the produce [sic] of reliable principles and methods, as required by Rule 702. Thus, Defendant

contends the Court erred in admitting the testimony and a new trial should be
awarded to Defendant.

(Doc. 105 at 20-21.)

Defendant's Rule 702 challenge goes to the reliability requirement.  Under this

prong, "admissibility is not based on whether a particular scientific opinion has the best

foundation, or even whether the opinion is supported by the best methodology or

unassailable research.  Instead, the court looks to whether the expert's testimony is

supported by 'good grounds.'"  *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d

Cir. 2017) (quoting *Paoli II*, 35 F.3d at 745)).  *Karlo* continued to explain that "[t]he standard

for reliability is not that high. . . . It is lower than the merits standard of correctness." *Id.*

Both the Supreme Court in *Daubert* and the Third Circuit have explained that

whether "good grounds" support an expert's potential testimony depends on many factors,

including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method
> has been subject to peer review; (3) the known or potential rate of error; (4) the
> existence and maintenance of standards controlling the technique's operation;
> (5) whether the method is generally accepted; (6) the relationship of the
> technique to methods which have been established to be reliable; (7) the
> qualifications of the expert witness testifying based on the methodology; and
> (8) the non-judicial uses to which the method has been put.

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833–34 (3d

Cir. 2020).  In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme

Court "makes clear that this list is non-exclusive and that each factor need not be applied in

every case." *Elcock v. Kmart Corp.*, 233 F.3d 734, 746 (3d Cir. 2000) (citing Kumho Tire, 526 U.S. at 152).

Considered within this legal framework, Defendant's challenge to the Court's admissibility determination must fail. After extensive examination, the Court admitted Dinh as an expert and specifically explored the "likelihood ratio" which was the calculation approach she used in determining the ratio regarding the DNA on the firearm being that of Defendant. (Doc. 101 at 106-132 (T. Tr. Day 3 106:16-132:13.) Dinh testified that the likelihood ratio approach is a standard that is used in the field of DNA analysis (*id.* at 121 (T. Tr. Day 3 121:19-21)); it is a validated method accepted in her field (*id.* at 122 (T. Tr. Day 3 122:16-19)); the method is based on accepted scientific principles (*id.* at 126 (T. Tr. Day 3 126:7-10)); that the calculation at issue is one she could do by hand (*id.* at 125 (T. Tr. Day 3 125:14-17)); and the mathematical foundation for the ratio is contained in the case file (*id.* (T. Tr. Day 3 126 :13-19)).

Based on Dinh's testimony, the Court found her qualified as an expert in DNA analysis:

> I find that the methodology that she used is based on reliable scientific principles, that the methodology itself is generally accepted in the scientific community, and I find that her opinion does fit, in that, it addresses relevant issues in this case, and on that basis, I'm going to allow her to testify, and she may make reference to her report, as she deems appropriate.

(Doc. 101 at 131-32.)

With the pending motion, Defendant provides no specific argument that the likelihood ratio approach used by Dinh did not meet the Rule 702 requirements and did not enjoy general acceptance within the relevant scientific community. Defendant's conclusory statement regarding the failures of Dinh's testimony do not show error. Defendant's statement that Dinh "was unable to testify as to whether the likelihood formula she had used to produce the testimony had been tested, or had been subject to peer review" (Doc. 105 at 20) is not an accurate characterization of her testimony. Dinh testified that the likelihood ratio approach was a "validated method" but she herself had not tested its accuracy. (*Id.* at 123-24 (T. Tr. Day 3 123:22-124:4).) Defendant's Counsel did not ask Dinh whether the method at issue had been subject to peer review generally but asked about her specific participation in peer review. He asked: "How about peer review? Did you participate in any peer review of this?"; and Dinh answered "I did not." (Doc. 101 at 24 (T. Tr. Day 3 24:5-7).) Regarding Defendant's assertion that Dinh did not testify as to the potential rate of error, the record does not reflect that Dinh was asked about rate of error (*see* Doc. 101 at 106-148) and, therefore, no conclusion can be drawn from her lack of testimony on the issue.

Based on the testimony reviewed above, the failings identified by Defendant regarding testing, peer review and potential rate of error (Doc. 105 at 20) do not undermine the Court's determination at trial that Dinh was qualified as an expert and could use the information in her report, including that based on the likelihood ratio approach. Therefore,

Defendant's assertion that he is entitled to a new trial based on the admission of Dinh's testimony is without merit.

## F. Motion to Dismiss the Indictment

Defendant's final basis for relief is that the Court erred when it denied his oral motion to dismiss the indictment made on the day the trial in this matter was set to begin, March 15, 2021. (Doc. 105 at 21.) Therein, Defendant identified two grounds for dismissal: first, the Grand Jury testimony consisted of reading the transcripts of grand jury testimony from two previous grand jury hearings, each of which resulted in indictments which were ultimately dismissed on speedy trial grounds; and second, there was an error in a question posed in a prior hearing which, as part of the transcript of that hearing, was read to the Grand Jury in this case. (*See* Doc. 70 at 1.) The Court orally denied Defendant's motion, providing reasons for the decision, on March 16, 2021, indicating that a written Memorandum Opinion would follow. (Doc. 100 at 3-14 (T. Tr. Day 2 3:2-14:18).) The Court issued its Memorandum Opinion and Order the next day, March 17, 2021. (Docs. 70, 71.)

As with his allegations regarding the Court's Speedy Trial Act and Sixth Amendment determinations made in 3:19-CR-233, Defendant again seeks reconsideration of a Court's determination unrelated to trial proceedings and evidentiary matters which arose in that context. Defendant does not complain of any decision made by the Court during trial or any other matter related to the trial or jury verdict. Rather, he seeks reconsideration of a decision made before the trial began.

As previously discussed, the propriety of raising this issue in the context of the current motion is unsupported. *See supra* pp. 17-19. While, unlike the issues discussed in sections IVB and IVC, here the reconsideration sought relates to a decision made in the above-captioned matter, this distinction does not mean that a merits analysis of the issue is warranted. Rather, viewed as a request for reconsideration, Defendant did not file the request within fourteen days of the Court's denial of the motion—with the Court's denial of the motion on March 16, 2021, the last day for filing the motion was March 30, 2021, and Defendant filed the pending motion on March 31, 2021. Further, Local Rule 7.10 requires that a supporting brief be filed with the motion and Defendant did not seek an extension of time to file a supporting brief until April 1, 2021, and, in that motion, there is no recognition of requirements regarding motions for reconsideration. (*See* Doc. 97.) Therefore, the Court's granting of the motion cannot be construed as allowing an extension of the time required in Local Rule 7.10.

The Court denies reconsideration on this procedural basis. Further, a substantive review of the issue pursuant to authority cited in section IVB above indicates that Defendant has presented no basis to reconsider the determination previously made.

## IV. CONCLUSION

For the reasons set forth above, the Court will deny Defendant Lance Green's

Motion for Judgment of Acquittal and Motion for a New Trial (Doc. 95).  A separate Order is

filed with this Memorandum Opinion.

Robert D. Mariani
United States District Judge