THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LANCE GREEN,** | : | |
| | : | |
| **Petitioner,** | : | **3:20-CR-165** |
| | : | **3:24-CV-209**[1] |
| **v.** | : | **(JUDGE MARIANI)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Respondent.** | : | |

## MEMORANDUM OPINION
### I. INTRODUCTION

Here the Court considers Petitioner Lance Green's *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Doc. 136). Petitioner raises three grounds for relief: 1) ineffective assistance of trial counsel; 2) his 18 U.S.C. § 922(g) sentence is unconstitutional; and 3) he was wrongly sentenced as an armed career criminal pursuant to the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). (*Id.* at 4-6.) In the underlying action, the July 14, 2020, Indictment contained the following charges: Count 1, Prohibited Person in Possession of a Firearm, 18 U.S.C. § 922(g); and Count 2, Possession of a Firearm with an Obliterated Serial Number, 18 U.S.C. § 922(k). A four-day bifurcated trial began on March 15, 2021, and the jury returned a verdict of guilty on both counts on March 18, 2021. (Docs. 87, 90.)

---

[1] Because the Civil Action Number is assigned for statistical purposes only, relevant filings are docketed at 3:20-CR-165 and all docket references in this Memorandum are to the criminal docket number.

Following the Court's determination that Petitioner was properly designated an armed career criminal pursuant to 18 U.S.C. § 924(e), he was sentenced on November 19, 2021, to a term of imprisonment of 235 months, the low end of the applicable guideline range of 235 to 293 months. (Doc. 129 at 2; Doc. 130at 1.)

For the reasons discussed below, the Court will deny Petitioner's § 2255 Motion. (Doc. 136.)

## II. BACKGROUND

### A. Factual Background[2]

Sheila Rodriguez testified that she was living in a duplex at 141 Second Avenue, Kingston, in a first-floor apartment, with her children Noelle and Andre Peele on October 5, 2017. (Doc. 100, Trial Transcript ("T. Tr.") Day 2 at 42:1-43:13.) Nasheena Curry testified that she was residing in the same duplex at 143 Second Avenue, Kingston, in the second-floor apartment. (Doc. 101, T. Tr. Day 3 at 3:18-24, 4:17-18.) On the morning of October 5, 2017, Curry said she got into a fight with Rodriguez and her children. (*Id.* at 3 5:13-17.) After the fight, Curry called Nakirah Williams and Lance Green for help. (*Id.* at 5:21-25, 6:1-4.) Curry then left the residence to pick up Williams and bring her back to the Second Avenue residence. (*Id.* at 7:13-17.) Rodriguez testified that she called the police when she saw Curry fighting with her daughter on the sidewalk in front of the house. (Doc. 100 at 44:3-12.)

---

[2] The Factual Background is based on testimony and evidence presented at the March 2021 trial.

Detective Robert Miller of the Kingston Municipal Police Department testified that, on October 5, 2017, he was a patrol officer and responded to the call related to a fight at 141 Second Avenue with Sergeant Sam Blaski from the Kingston Municipal Police Department. (Doc. 101 at 8: 13-22.)  They arrived at the Second Avenue location at approximately 10:00 a.m. and spoke with Sheila Rodriguez, Noelle Peele, and Andre Peele. (*Id.* at 39:2-4, 40:5-6.)  Officers also questioned Curry about the incident. (*Id.* 7:18-22, 39:20-21.)  Miller testified that, while at the scene interviewing Rodriguez and her children, a statement was made that Curry had said "bring the strap," which means the gun. (*Id.* at 49:23-50:6.)  After speaking with Rodriguez, her children, and Curry, Miller and Blaski decided to file charges through the mail and left the scene. (*Id.* at 40:12-15.)

Curry testified that after she and Williams arrived at her residence, Green arrived in a white car. (Doc. 101 at 7:11-8:10.)  Both Curry and Williams identified Lance Green in Court as the man to whom they were referring. (*Id.* at 6:9-6, 27:2-13.)  After Green arrived, Green, Williams and Curry went downstairs, and Green knocked on Rodriguez's door. (*Id.* at 8:17-21.)  Andre Peele answered the door and shortly afterwards another fight broke out among the women. (*Id.* at 9:10-15.)  Curry testified that, at some point during the fight, Green pulled a gun out of his waistband and pointed it at Andre Peele. (*Id.* 9:23-10:9.)  Rodriguez testified that she could see that the "guy" who came with Curry had a gun on his waist and, at some point during the fight, he removed the gun from his waistband. (Doc. 100 at 44:16-24, 46:13-21.)  Williams testified that the fight stopped when "somebody yelled

3

about a gun." (Doc. 101 at 28:20-21.) When the fight ended, Curry, Williams and Green went upstairs to Curry's apartment. (*Id.* at 10:15-17.) Williams testified that she saw Green with a gun when they were going up the stairs. (*Id.* at 29:9-11.)

Miller testified that he and Blaski were dispatched back to the scene at approximately 10:30 a.m. (Doc. 101 at 40:16-18.) When they arrived, Officers noticed a white vehicle in the driveway that was not there previously. (*Id.* at 40:19-25.) Officers spoke with Rodriguez and her children and observed visible injuries on Noelle Peele. (*Id.* at 41:1-10.) They informed Officers that they were threatened with a firearm by the "heavy-set black male." (*Id.* at 43:4-8, 44:1-5.) Officers attempted to speak with Curry and the individuals in the upstairs apartment, but no one came to the door when they knocked. (*Id.* at 10:18-24, 41:13-18.) Officers decided to conduct surveillance. (*Id.* at 41:23, 42:2.)

Curry testified that, after they went upstairs, she, Williams, and Green decided to leave her apartment but, before doing so, Green took the gun out and lifted Curry up to put the gun in the attic of her bedroom closet. (Doc. 101 at 10:25-11:22.) They hid the gun because they "did not want to drive around with any weapons." (*Id.* at 11:6-7.)

While conducting surveillance, Blaski received another call for assistance and left the area. (Doc. 101 42:9-10.) Miller testified that, after Blaski left, he observed Curry and another female and a male leave Curry's residence and get into the white car in the driveway. (*Id.* at 42:11-15.) Miller began to follow the vehicle driven by Curry until he felt it was safe to conduct a traffic stop. (*Id* .at 3 42:23-25.) Due to a firearm potentially being

4

involved, Miller did not initiate the traffic stop until he had assistance from other officers. (*Id.* at 43:9-25.)  Once the car was detained, Curry and her two passengers, who were identified as Williams and Green, were taken to the Kingston Police Department.  (*Id.* at 44:11-15.)

Miller testified that initially Curry and Williams indicated that they did not know what the police were talking about and that nothing had happened but, later in the day, they provided statements as to what had happened.  (Doc. 101 at 45:9-17.)  Curry testified that she told police about what had happened and about the gun, including where it was hidden.  (*Id.* at 13:14-21.)  Williams testified that she had told the police what had happened, but she did not know more about the gun she had seen.  (*Id.* at 30:5-6, 20-23.)  After speaking with Curry and Williams, Officers obtained a search warrant for 143 Second Avenue.  (*Id.* at 46:2-6.)

Miller testified that, during the execution of the search warrant, ATF Special Agent Ryan Kovach located a firearm in a crawl space in the attic of Curry's apartment.  (Doc.101 at 46:18-22.)  The firearm was seized as evidence and subsequently sent to the Pennsylvania State Police Lab for testing.  (*Id.* at 47:1-12.)

After extensive discussion, Ut Dinh, a forensic DNA scientist for the Pennsylvania State Police who authored the report on the DNA analysis of the confiscated gun, was accepted at trial as an expert in the field of DNA analysis.  (Doc. 101 at 107:16-131:25.)  Ut Dinh testified that testing of DNA found on the firearm indicated that it was 33 trillion times more likely to be Lance Green's DNA and that of an unknown, unrelated individual than the

DNA of two unknown, unrelated individuals in the Caucasian population; it was 60 trillion times more likely to be Lance Green's DNA and that of an unknown, unrelated individual than the DNA of two unknown, unrelated individuals in the African American population; and it was 5.7 trillion times more likely to be Lance Green's DNA and that of an unknown, unrelated individual than the DNA of two unknown, unrelated individuals in the Hispanic population. (*Id.* at 140:18-141:9.)

After the Government rested, Green's counsel, Joseph O'Brien, made a motion for judgment of acquittal on Count 2, Possession of a Firearm with an Obliterated Serial Number, asserting that there was no direct evidence that Mr. Green had any knowledge that the serial number on the firearm he possessed had been obliterated. (Doc. 102, T. Tr. Day 4 at 3:7-4:1.) The Court denied the motion, finding that sufficient evidence supported each element of the charge in Count 1 for the charge to go to the jury. (*Id.* at 7:1-9:4.)

Mr. O'Brien then offered one witness, DNA Forensic Consultant Lisa Desire. (Doc. 102 at 9:8-18.) The Court accepted Ms. Desire as an expert in the field of "DNA collection procedures and secondary transfer of DNA." (*Id.* at 13:9-11.) Ms. Desire reviewed the Government's DNA report, criticizing the use of a single cotton swab to swab several points on the gun and other aspects of the report, including probability conclusions. (*Id.* at 17:23-28:15.) However, she agreed that Mr. Green could not be excluded as one of the major contributors regarding the DNA found on the gun. (*Id.* at 27:23-28:1.)

## B. Procedural Background[3]

The procedural background of this case begins with Defendant's arrest on October 5, 2017, by the Kingston Municipal Police Department which led to Pennsylvania state law charges and to his Indictment on January 23, 2018, by a federal grand jury for Prohibited Person in Possession of a Firearm, 18 U.S.C. § 922(g), and Possession of a Firearm with an Obliterated Serial Number, 18 U.S.C. § 922(k), under docket number 3:18-CR-21. Defendant was arraigned on these charges before Magistrate Judge Joseph F. Saporito on February 13, 2018, and pled not guilty to the charges in the Indictment. Magistrate Judge Saporito appointed CJA Attorney Gino Bartolai to represent Defendant and ordered Defendant detained pending trial.

Also on February 13, 2018, District Judge A. Richard Caputo scheduled the matter for trial on April 23, 2018, and set March 13, 2018, as the deadline for filing pretrial motions and briefs. Thereafter, Defendant filed and Judge Caputo granted several motions to extend the time to file pretrial motions. No pretrial motions were timely filed. However, on September 26, 2018, several months after the last established pretrial motion deadline had passed, Defendant filed a Motion for Leave to File Motion to Suppress Evidence Obtained as Result of Illegal Arrest Nunc Pro Tunc and on the same day filed the Motion to Suppress

---

[3] The background information relating to 3:18-CR-21 and 3:19-CR-233 is derived from the Background section of the Court's Memorandum Opinion issued in 3:19-CR-233 regarding the Motion of Defendant, Lance Green, to Dismiss for Violation of the Speedy Trial Act and the United States Constitution (Doc. 34). (3:19-CR-233 Doc. 50 at 1-8.) The summary therein contains citations to relevant records. However, the Court omits those citations from the recitation set out in the text.

Evidence Obtained as a Result of Illegal Arrest.  Judge Caputo granted the Motion for Leave to File Motion to Suppress Evidence Obtained as Result of Illegal Arrest Nunc Pro Tunc on October 1, 2018.  By Memorandum and Order of November 28, 2018, Judge Caputo denied the motion to suppress.  On November 29, 2018, he set the matter for trial to commence on December 17, 2018.  On December 6, 2018, Defendant filed an unopposed motion to continue trial which Judge Caputo granted on December 13, 2018.  By Order of December 13, 2018, Judge Caputo set the trial for April 30, 2019.

Attorney Bartolai filed a Motion for New Counsel on January 20, 2019, and Judge Caputo appointed Enid Harris, Esquire, on January 29, 2019.  On February 21, 2019, Attorney Harris filed the Motion to Withdraw as Counsel Due to Conflict of Interest which Judge Caputo granted by Order of February 27, 2019.  On March 6, 2019, Joseph O'Brien, Esquire, was appointed to represent Defendant.

On April 18, 2019, Defendant filed a motion to continue the trial.  Judge Caputo granted the motion and set the trial for June 3, 2019.  On May 13, 2019, Defendant filed the Motion to Continue Trial and for Leave to File Motion to Dismiss for a Violation of the Speedy Trial Act which Judge Caputo granted by Order of May 14, 2019.  By Memorandum of July 19, 2019, Judge Caputo agreed that more than seventy non-excludable days elapsed from June 13, 2018, until September 26, 2018, in violation of the Speedy Trial Act, 18 U.S.C. 3161(c)(1).  He noted that the Government conceded that one hundred and thirty-three non-excludable days ran between Defendant's initial appearance and the filing of

8

Defendant's Motion to Suppress on September 26, 2018. Judge Caputo then considered the statutory factors set out in 18 U.S.C. § 3161(c)(1) relevant to the determination of whether the Indictment should be dismissed with or without prejudice and concluded that the factors weighed in favor of dismissal without prejudice. Therefore, by Order of July 19, 2019, Judge Caputo granted the Motion to Dismiss the Indictment pursuant to the Speedy Trial Act and dismissed the Indictment without prejudice.

On the same day as the dismissal of the Indictment in 3:18-CR-21, the Government filed a criminal complaint under docket number 3:19-CR-233 and charged Defendant with the two offenses previously charged. A grand jury indicted Defendant on July 30, 2019, and Defendant had his initial appearance before Magistrate Judge Karoline Mehalchick on July 31, 2019, where he entered a plea of not guilty and was appointed CJA attorney Joseph O'Brien. On motion of the Government attorney, Magistrate Judge Mehalchick ordered Defendant detained pending trial.

On August 1, 2019, Judge Caputo issued a scheduling Order directing all pretrial motions to be filed by August 20, 2019, and setting jury selection and trial for October 7, 2019. On September 27, Defendant filed a motion to amend the scheduling Order and requested an extension of time until October 21, 2019, to file pretrial motions. On October 2, 2019, Judge Caputo granted Defendant's request and indicated that a trial date would be set after the expiration of the motion deadline. On October 21, 2019, Defendant filed the Motion to Suppress Evidence as a Result of Unconstitutional Search and Seizure. On

9

December 2, 2019, Judge Caputo issued a Memorandum Order denying Defendant's motion.

On December 4, 2019, the Government filed the Motion to Set Trial Date in which it indicated that "[t]he Speedy Trial time expires on December 13, 2019" and requested the Court to schedule a trial immediately.  On December 18, 2019, at the request of the Government, Judge Caputo held a conference call with counsel for the Government and counsel for Defendant regarding the Government's Motion to Set Trial Date.  On the same day, the case was reassigned to the undersigned for all further proceedings by verbal order.

On December 19, 2019, both parties participated in a conference call with the Court. Defense counsel indicated that, by the end of the year, he would be filing a motion to dismiss based on a Speedy Trial Act violation.  Government counsel later reported that she contacted Defendant's counsel on January 3, 2020, because no motion had been filed and he indicated that his client no longer wanted a motion to dismiss filed.  Government counsel also reported that she again spoke with Defendant's counsel on January 6, 2020, and he again stated Defendant did not want the motion filed.  On the same day, Government counsel notified the Court that no motions would be filed.  The Court issued an Order on January 6, 2020, setting the case for trial on January 22, 2020.

Defendant's counsel subsequently requested a telephone conference which the Court scheduled by Order of January 13, 2020, for January 14, 2020.  At the telephone conference, Defendant's counsel informed the Court that Defendant wanted to file a Speedy

Trial Act motion and move for DNA related discovery.  Defendant filed his Speedy Trial Act motion on January 21, 2020.  On January 22, 2020, the Court continued the trial, to be rescheduled if necessary following resolution of Defendant's motion.  After the motion was fully briefed, the Court set a hearing for June 24, 2020.

On April 3, 2020, Defendant filed the Motion of Defendant, Lance Green, for Reconsideration of Detention Order seeking his release under 18 U.S.C. § 3142(i) for reasons related to the COVID-19 pandemic and the preparation of Defendant's defense. This motion was referred to Magistrate Judge Mehalchick who denied it by Memorandum and Order of April 30, 2020.  On June 18, 2020, Defendant filed the Motion of Defendant, Lance Green, for Pretrial Release.  He stated that the basis for his motion was the same as that set out in his April 3, 2020, motion and relevant briefing.  He also asked that the Court allow him to address the issue at the June 24, 2020, hearing.  At the hearing held on June 24, 2020, the Court heard argument on both the speedy trial and release motions.  On June 25, 2020, the Court issued the Order Setting Conditions of Release with which the Court ordered that Defendant be released on personal recognizance subject to numerous specific conditions.

On July 9, 2020, the Court granted Defendant's Motion to Dismiss for Violation of the Speedy Trial Act and the United States Constitution in part and denied it in part.  The motion was granted insofar as the Court concluded that the Speedy Trial Act was violated and the motion was denied insofar as the dismissal was without prejudice.

Pertaining to the above-captioned matter, on July 15, 2020, a grand jury again indicted Green with Prohibited Person in Possession of a Firearm and Possession of a Firearm with Obliterated Serial Number (Doc. 1). A summons was issued, and Magistrate Judge Mehalchick held Green's initial appearance. (Docs. 8, 10.) Magistrate Judge Mehalchick continued Green's pretrial release with no objection from the Government.

On August 17, 2020, Green was arrested for a state probation violation and incarcerated in the Lackawanna County Prison ("LCP"). During the initial search at the LCP, officers discovered a bag of suspected marijuana in his genitals and a bag of suspected cocaine in his buttocks. On August 27, 2020, Lackawanna County Detectives filed a criminal complaint against Green for the contraband found during the search. (Magisterial District Number 45-1-06, CR 357-20.)

Green filed a pretrial motion to suppress evidence on August 5, 2020, and the Court held a Suppression Hearing on November 23, 2020. (Docs. 17, 30.) Also on November 23, 2020, the Government filed a motion to revoke Green's pretrial release due to the new arrest. (Doc. 28.) Magistrate Judge Mehalchick granted the government's motion and revoked Green's pretrial release and ordered him detained. (Docs. 31, 38.) On January 8, 2021, this Court denied Green's pretrial motions and scheduled trial to commence on March 15, 2021. (Docs. 42-44.)

At the start of Court proceedings on Monday, March 15, 2021, Defendant's counsel informed the Court that his client "asked him to make the following motion, with respect to

12

the grand jury proceedings, and the motion is to dismiss the case on the grounds of misconduct before the Grand Jury." (Doc. 99 at 2:11-13.) Regarding the timing of the motion, Mr. O'Brien explained that he had just received the requested Grand Jury minutes from the Government on the preceding Friday. (*Id.* at 6:18-24.) The Court heard argument on the motion that afternoon. (*Id.* at 7:8-12:4.) Based on review of the parties' arguments and relevant caselaw, the Court determined that more factual information was needed before a ruling could be made. (*Id.* at 12:5-14:14.) The Court excused the jury panel for the day with the expectation of resolving the oral motion the next morning and continuing with the trial. (*Id.* at 17:10-16.) The Court reconvened the following morning and orally announced the decision to deny the motion, adding that a formal written opinion would follow. (Doc. 100 at 3:19-14:18.) Jury selection began thereafter. (Doc. 100 at 15.) The formal Memorandum Opinion and Order issued on March 17, 2021. (Docs.70, 71.)

On March 18, 2021, following a bifurcated jury trial, Green was convicted on both counts contained in the Indictment. (Docs. 87, 90.) He filed a Motion for Judgment of Acquittal (Doc. 95) on March 31, 2021, which the Court denied by Memorandum Opinion (Doc. 123) and Order (Doc. 124) of November 10, 2021.

The Presentence Investigation Report (Doc. 120) was filed on September 29, 2021, and the Addendum to the Presentence Report (Doc. 119) was filed on the same date. The Addendum identified several objections to the PSR lodged by Defendant. (Doc. 119 at 1-4.) The Court overruled all objections at the Sentencing Hearing held on November 19, 2021.

13

(Doc. 134 at 3-11.)  As set out above, Defendant was sentenced to a term of imprisonment of 235 months, the low end of the applicable guideline range of 235 to 293 months.  (Doc. 129 at 2; Doc. 130 at 1.)

On November 22, 2021, Defendant filed a timely Notice of Appeal.  (Doc. 131).  The Third Circuit affirmed the Court's judgment on September 15, 2022.  (App. No. 21-3171, Doc. 49.)[4]  Defendant filed a Petition for writ of certiorari on December 14, 2022, and on February 21, 2023, the Supreme Court denied the Petition.  *Green v. United States*, 143 S. Ct. 111 (Mem) (2023).

Green's pending *pro se* 28 U.S.C. § 2255 Motion was timely filed on February 6, 2024.  (Doc. 136.)  The Government filed its response on April 18, 2024.  (Doc. 145.) Green filed a reply brief on May 2, 2024.  (Doc. 151.)

## III. STANDARD OF REVIEW

A federal prisoner in custody under the sentence of a federal court may, within one year from when the judgment becomes final, move the sentencing court to "vacate, set aside, or correct" a sentence "imposed in violation of the Constitution or laws of the United States."  28 U.S.C. § 2255(a).  Generally, the petitioner bears the burden of proof in § 2255 proceedings.  *See United States v. Hollis*, 569 F.2d 199, 205 (3d Cir. 1977).

---

[4] The Westlaw citation is *United States v. Green*, No. 21-3171, 2025 WL 4244275 (3d Cir. Sept. 15, 2022) (not precedential).

14

"The general rule [is] that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." *Massaro v. United States*, 538 U.S. 500, 504 (2003) (citing *United States v. Frady*, 456 U.S. 152, 167-68 (1982); *Bousley v. United States*, 523 U.S. 614, 621-22 (1998)).  This is because failing to raise an issue on direct appeal will "procedurally default," or bar, that issue from being raised in habeas.  *United States v. Garth*, 188 F.3d 99, 106 (3d Cir. 1999). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 621 (1998).  It is the defendant's burden to show cause and prejudice or actual innocence to proceed with his claims.  *Id.*

To show "cause," the petitioner must show that "some objective factor external to the defense impeded counsel's efforts to raise the claim." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991).  Some external factors that have been found to constitute "cause" are "interference by officials," "a showing that the factual or legal basis for a claim was not reasonably available to counsel," and "ineffective assistance of counsel." *Id.* at 494. Ultimately, for a petitioner "[t]o show cause, he must explain what prevented him from timely raising the defaulted claim." *Richardson v. Superintendent Coal Twp. SCI*, 905 F.3d 750, 759 (3d Cir. 2018).  Once a petitioner has shown "cause" to excuse the procedural default, he must still show "not merely that the errors . . . created a possibility of prejudice, but that

they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). Accordingly, the defendant must prove that, if not for the error, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 289 (1999).

Section 2255 does not provide a remedy for all errors that may have been made at trial or sentencing. *United States v. Essing*, 10 F.3d 968, 977 n.25 (3d Cir. 1993). Rather, § 2255 permits relief for an error of law or fact only when there is "a fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." *Hill v. United States*, 368 U.S. 424, 428 (1962). The claimed defect must "present 'exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Id.* (citations omitted).

Allegations are not sufficient to support a motion under § 2255. *Blackledse v. Allison*, 431 U.S. 63, 74 (1977). A petitioner must set forth facts to support his contentions. *Zettlemover v. Fulcomer*, 923 F.2d 284, 298 (3d Cir. 1991). "[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court." *United States v. Thomas,* 221 F.3d 430, 437 (3d Cir. 2000) (citing *United States v. Dawson*, 857 F.2d 923, 928 (3d Cir. 1988)).

If the court determines that the sentence was not authorized by law, was unconstitutional, or is otherwise open to collateral attack, the court may vacate the

judgment, resentence the prisoner, or grant the prisoner a new trial as appropriate. *See* 28 U.S.C. § 2255(b).

## IV. ANALYSIS

Petitioner's form motion identifies three grounds for relief. (Doc. 136 at 5-7.) Ground One states that Petitioner "was deprived of Constitutionally effective assistance of counsel in violation of the Sixth Amendment." (Doc. 156 at 5.) Ground Two states that "[18 U.S.C. §] 922(g)(1) is unconstitutional as applied." (*Id.* at 6.) Gound Three states that Petitioner "was sentenced erroneously to ACCA ([18 U.S.C. §] 924(e))." (*Id.* at 7.) Taken alone or together, the Court concludes that Petitioner is not entitled to the relief requested.

## A. Ineffective Assistance of Counsel

Petitioner identifies four bases for his ineffective assistance of counsel claim: 1) Court appointed counsel failed to conduct meaningful investigation and failed to interview any witnesses; 2) Court appointed counsel failed to present any meaningful defense; 3) Court appointed counsel failed to present a meaningful adversarial challenge; and 4) Court appointed counsel lacked any meaningful trial strategy. (Doc. 136 at 5.) Although ineffective assistance of counsel claims are properly raised on collateral review, *Massaro*, 538 U.S. at 504, the Court concludes that Petitioner's claims do not satisfy the ineffective assistance of counsel standard set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

17

To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the two-part test set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner must demonstrate "(1) that counsel's performance was deficient, that is, it fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced his client." *Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2007) (*citing Strickland,* 466 U.S. at 689-692). Under the first prong of the analysis set out in *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner must demonstrate that counsel's performance was deficient, that is, it fell below an objective standard of reasonableness. *Albrecht*, 485 F.3d at 103 (*citing Strickland*, 466 U.S. at 689-92). The appropriate measure of attorney performance is "reasonableness under prevailing norms." *Strickland*, 466 U.S. at 688.

A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. Courts must recognize the strong presumption that counsel has rendered adequate assistance and that all significant decisions were made in the exercise of reasonable professional judgment. *Id.* at 689; *see also Buehl v. Vaughn,* 166 F.3d 163, 169 (3d Cir.1999). The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison,* 477 U.S. 365, 38 (1986).

The second prong of the *Strickland* test requires the petitioner to show that counsel's deficient performance prejudiced the defense. *Albrecht*, 485 F.3d at 127 (*citing Strickland*, 466 U.S. at 689-92). Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland,* 466 U.S. at 691. To establish prejudice, the defendant must

> show that there is a reasonable probability that the result of the trial would have been different absent the deficient act or omission. A reasonable probability is a probability sufficient to undermine confidence in the outcome. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

*Hinton v. Alabama,* 571 U.S. 263, 275 (2014) (citations omitted).

*Strickland* further held that both prongs must be established to meet the claimant's burden, and that if either prong is not satisfied the claim must be rejected. 466 U.S. at 697. The Court also explained that the reviewing court has discretion in applying the standard:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

> *Id.*

In his Motion, Petitioner provides no information in support of his asserted grounds for relief. However, in his Reply Brief (Doc. 151), Petitioner first cites counsel's general

19

failure to track down and interview witnesses and his specific failure to interview Andre Peele who allegedly told ATF Agent Ryan Kovach when Kovach contacted him about a subpoena in this case that he did not know what Kovach was talking about, he did not see anything, and the police officers were lying. (*Id.* at 3.) Petitioner concludes that counsel's deficiencies regarding Andre Peele "are severe and cannot be characterized as the product of strategy, judgment, therefore ineffectiveness is clear." (Doc. 151 at 5.)

Beyond setting out the need to show prejudice (*see* Doc. 151 at 4), Petitioner does not substantively address the prejudice prong of the *Strickland* analysis. Therefore, he has made "an insufficient showing on one [component]" of the *Strickland* inquiry, 466 U.S. at 697, and has not satisfied his burden of showing entitlement to relief on the grounds asserted. *See supra.*

Further, the Court's review of the record does not support a finding that "there is a reasonable probability that the result of the trial would have been different absent the [allegeldly] deficient act or omission." *Hinton*, 571 U.S. at 275. Rather, the record shows that ample testimony and evidence supported the jury's finding of guilt on both counts. As set out in the Factual Background section above, Curry and Williams both testified that Petitioner had a gun at the scene; Curry testified that she and Petitioner hid the gun before leaving her house; both Curry and Williams testified that they told officers about events which took place at 141 Second Avenue, Kingston, on October 5, 2017; Curry told officers where the gun was hidden; and officers found the gun at the identified location. *See supra*

*pp.* 2-6. Further, forensic DNA testing of the confiscated weapon supported a conclusion that Petitioner had handled the gun. *See supra* pp. 6-7.

With this significant evidence supporting the jury's verdict, the Court concludes that there is not "a reasonable probability that the result of the trial would have been different," *Hinton*, 571 U.S. at 275, if Andre Peele had testified at trial and offered testimony consistent with that proffered by Petitioner. The combination of the testimony of Curry and Williams and the results of the DNA analysis preclude Petitioner from showing that "there is a reasonable probability that, absent the [alleged] errors, the factfinder would have had a reasonable doubt respecting guilt." *Hinton v. Alabama,* 571 U.S. at 275.

Petitioner next asserts that Mr. O'Brien failed to present any meaningful defense. (Doc. 151 at 5.) He points to former counsel Gino Bartolai's three motions for an extension of time to file pretrial motions in criminal case number 3:18-CR-21, asserting these motions "gave the Government extra time to prepare a case against him." (Doc. 151 at 5.) This assertion is of no relevance to his ineffective assistance of counsel claim in this case.

Petitioner also identifies events which took place in criminal case number 3:19-CR-233, accusing Mr. O'Brien and AUSA Roberts of colluding to stop the running of the speedy trial clock and hindering him from filing a successful speedy trial motion. (*Id*. at 5-6.) Again, what took place in another case is not relevant to the current § 2255 motion. As to the particular accusation, the Court notes that his Speedy Trial Act Motion in 3:19-CR-233 was, in fact, granted on July 9, 2020. *See supra* p. 12.

21

Regarding the above-captioned matter, Petitioner contends that Mr. O'Brien's performance was deficient because Mr. O'Brien and AUSA Roberts came to an agreement off the record that Mr. O'Brien would not object to Sheila Rodriguez's testimony which "was used to lay a foundation of pointing the finger to Green." (Doc. 151 at 6.)  As set out above, it was Curry and Williams who identified Petitioner and told police about his gun-related activity on October 5, 2017.  *See supra* pp. 4-5.  Petitioner was not mentioned by name nor otherwise identified in Court during Rodriguez's testimony.  Rather, during Rodriguez's testimony about the events of October 5, 2017, she said regarding the second altercation that Curry brought "[a]nother female and a guy" with her, she could see when she went out on the porch that the man had a gun on his waist, and, at some point, he removed the gun from his waistband.   (Doc. 100 at 44:16-24, 46:13-21.)  Mr. O'Brien objected to a question about whether Rodriguez had told the police that the man with Curry had a handgun and the Court sustained his objection.  (*Id.* at 47:15-19.)

Though Petitioner finds fault with Mr. O'Brien's failure to cross-examine Rodriguez and "allowing [her] to tell a story unchallenged without identifying the defendant" (Doc. 151 at 6), he does not say what Mr. O'Brien should have done differently or how he was prejudiced by the lack of cross-examination of Rodriguez.  As with the Court's decision on prejudice related to the Andre Peele issue, nothing related to counsel's handling of Sheila Rodriguez's testimony establishes prejudice in that there was extensive corroborative and independent evidence to support the jury's verdict such that cross-examining Sheila

Rodriguez would not have given rise to a reasonable doubt respecting Lance Green's guilt. *See Hinton*, 571 U.S. at 275.

As to Petitioner's claims that his counsel "failed to present a meaningful adversarial challenge" and "lacked any meaningful trial strategy" (Doc. 136 at 5), he speaks only in generalities, noting Andre Peele's alleged statement that the police were lying and Rodriguez's unchallenged testimony. (*Id.* at 6.)  Further discussion of these vague and conclusory allegations is not warranted.  *Thomas*, 221 F.3d at 437.

However, if the Court considers whether the lack of Andre Peele's testimony combined with the failure to challenge Rodriguez's testimony satisfy the *Strickland* prejudice standard, the Court finds no basis to conclude that counsel's performance prejudiced Petitioner. *See Johnson v. Mahanoy*, 144 F.4th 178, 197 (3d Cir. 2025) (considering cumulative prejudice claim, i.e., where "errors that individually do not warrant habeas relief may do so when combined"). If Andre Peele had testified that he did not know what Kovach was talking about, he did not see anything, and the police officers were lying (Doc. 151 at 3), and if Rodriguez testified with greater specificity about the man with the gun or had been challenged about her recollection of the man having a gun, the facts remained that 1) Curry and Williams testified unequivocally about Petitioner having a gun when he came to 141 Second Avenue on October 5, 2017, and that he had the gun with him when he went downstairs; 2) Curry testified about hiding the gun with Petitioner and telling police about where it could be found; 3) Kovach located the firearm in a crawl space in the attic of

23

Curry's apartment where she said she and Petitioner had hidden it; and 4) DNA evidence supported a conclusion that Petitioner had handled the gun. *See supra* pp. 4-7. Given these unrefuted facts, Defendant cannot show that "there is a reasonable probability that the result of the trial would have been different absent the [alleged] deficient act[s] or omission[s]." *Hinton*, 571 U.S. at 275. Therefore, Petitioner's ineffective assistance of counsel claim is without merit.

### B.  18 U.S.C. § 922(g)(1)

In Ground Two, Petitioner asserts that 18 U.S.C. § 922(g)(1) is unconstitutional as applied. (Doc. 151 at 5.) He adds that he "is among the People, in Connection to the Second Amendment of the Constitution." (*Id.*) Petitioner indicates that he did not raise this claim on appeal because it is based on a change in the law. (*Id.*) Petitioner's reply brief clarifies that the law upon which he relies is *New York State Rifle & Piston Association, Inc. v. Bruen*, 597 U.S. 1 (2022), and *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023). (Doc. 151 at 7.) The Government asserts that Petitioner's claim pursuant to § 922(g)(1) should be denied because § 922(g)(1) constitutionally bars him from possessing a firearm because of dangerousness associated with his drug activity. (Doc. 145 at 39-40.) The Court concludes that *Bruen* and *Range* do not undermine Petitioner's 18 U.S.C § 922(g)(1) conviction in this case and that § 922(g)(1) is constitutional as applied to him.

Petitioner makes no argument other than that he is one of "the people" protected by the Second Amendment, a fact which the Government concedes. (Doc. 151 at 8; Doc. 145

at 33.)  However, the Court will proceed with an analysis of whether § 922(g)(1) is constitutional as applied to Petitioner.  An analysis of a Second Amendment challenge proceeds in two steps: (1) whether "the Second Amendment's plain text covers an individual's conduct," and (2) whether the law "is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 24.  The second element requires the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Range v. Attorney General*, ("*Range II*"), 124 F.4th 218, 225 (3d Cir. 2024) (quoting *Bruen*, 597 U.S. at 19).[5]

*Range II* establishes that individuals convicted of a felony "remain[ ] among 'the people' despite" their prior convictions. 124 F4th at 228.  The first element of the as applied challenge is met because, as applied to Petitioner, § 922(g)(1) "regulates 'quintessential Second Amendment conduct, possessing a handgun.'" *United States v. Harris*, 144 F.4th 154, 157 (3d Cir. 2025) (quoting *United States v. Moore*, 111 F.4th 266, 269 (3d Cir. 2024)).

Turning now to the second element, Third Circuit precedent shows that application of § 922(g)(1) to Petitioner "is consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24. In *United States v. Quailes*, 126 F.4th 215 (3d Cir. 2025), the Third Circuit held that "§ 922(g)(1) is constitutional as applied to convicts on parole or

---

[5] *Range II* is not discussed in the parties' submissions because it was filed on December 23, 2024, i.e., after the parties had submitted their briefs.  However, supplemental briefing is not required because Petitioner is clearly foreclosed from the relief requested both because of his criminal history and the fact that he committed the § 922(g) defense while on state parole.

probation." *Id.* at 224.  The Presentence Investigation Report ("PSR") indicates that

Petitioner was on parole when he committed the 18 U.S.C. § 922(g)(1) offense.  (Doc. 120,

PSR ¶ 49 (citing ¶¶ 45, 46; *see also* Doc. 121 at 2).)  Petitioner did not object to this finding.

(*See* Doc. 119.)  Therefore, relief pursuant to *Bruen* and *Range* is foreclosed in the

circumstances of this case.

Further, as discussed by the Government, considerations of dangerousness also

foreclose the relief requested.  the Government asserts that "there is clear historical support

for restricting the possession of firearms by persons who, like Green, previously committed

dangerous felonies."  (Doc. 145 at 33-34.)

> *Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025), instructs that

> Courts adjudicating as-applied challenges to § 922(g)(1) must consider a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction, to evaluate whether he meets the threshold for continued disarmament.  As [*Range v. Attorney General*, 124 F. 4th 218 (3d Cir. 2025) ("*Range II*"),] iillustrated, consideration of intervening conduct plays a crucial role in determining whether application of § 922(g)(1) is constitutional under the Second Amendment. *See* 124 F.4th at 232. Indeed, such conduct may be highly probative of whether an individual likely poses an increased risk of "physical danger to others" if armed. *Id.*

*Pitsilides*, 128 F.4th at 212.

> In *United States v. Walters*, 151 F.4th 122 (3d Cir. 2025), discussion of the

parameters of the second *Bruen* element is also instructive.

> In *Range II's* "narrow" decision, where we expressly declined to "preview how this Court would decide future Second Amendment challenges," we held that § 922(g)(1) violated the Second Amendment as applied to Range because there

26

was "no evidence that [Range] poses a physical danger to others," his offense was not "closely associated with physical danger," and his conviction occurred "[m]ore than two decades" earlier. *Range II*, 124 F.4th at 230, 232, 232 n.13. So Walters's arguments under *Range II* are unavailing. And our decision in [*United States v. Dorsey*, 105 F.4th 526, 528 (3d Cir. 2024)], explains why.

There, we held that a four-year-old conviction for carrying a firearm without a license was not substantially similar to Range's over two-decade-old food stamp fraud conviction that was followed by little to no interaction with law enforcement. 105 F.4th at 532; *Range II*, 124 F.4th at 223. Just as in *Dorsey*, "[Walters]'s statute[s] of conviction and the nature of his prior offense[s] are meaningfully different from Range's." *Dorsey*, 105 F.4th at 530, 532. Walters's criminal history is more extensive than either Range's or Dorsey's. Between 2005 and 2012, Walters had nine criminal convictions, including three for the distribution of controlled substances. Therefore, Walters cannot show that it was plainly "beyond dispute that he [was] similarly situated to Range for Second Amendment purposes." *Id.* As the *Dorsey* court explained, "[i]t is far from clear that" an offense for "failure to comply with a state law regulating the possession and use of deadly weapons" is "similarly situated ... for Second Amendment purposes" to "essentially a crime of dishonesty." Id. at 530.

Unlike Range and his decades-old fraud conviction, it is not plain that someone convicted of three drug trafficking convictions does not pose a physical danger to others. As we have explained, drug trafficking may be the kind of conviction justifying disarmament because dealing drugs runs the risk of violence. *See Pitsilides v. Barr*, 128 F.4th 203, 213 (3d Cir. 2025). And if the "Second Amendment's touchstone is dangerousness," then it does not plainly follow that Walters's conviction is unconstitutional. *Id.* (quoting *Folatjar v. Att'y Gen.*, 980 F.3d 897, 924 (3d Cir. 2020) (Bibas, J., dissenting)). Based on our precedent, we evaluate the individual's criminal history before deciding whether § 922(g)(1) has been unconstitutionally applied. *Id.* at 212; see also *Range II*, 124 F.4th at 232 (noting that Range had no significant interaction with law enforcement following his fraud conviction). When looking at the totality of Walters's criminal history, his three convictions for drug trafficking, alone, cut against his as-applied challenge. Therefore, it is hardly plain that it is unconstitutional to disarm, even permanently, a person convicted of non-violent drug trafficking offenses.

27

*United States v. Walters*, 151 F.4th 122, 134–35 (3d Cir. 2025), *cert. denied*, 223 L. Ed. 2d 518 (Jan. 12, 2026).

Here, the PSR indicates that Petitioner had at least fourteen (14) criminal convictions from 1997 to September 14, 2021. (Doc. 120, PSR ¶¶ 34-47.) Petitioner's criminal history includes first-degree robbery, Distribution and Possession with Intent to Distribute Cocaine Base, and Possession with Intent to Deliver a Controlled Substance on two separate occasions, the last of which occurred when this case was pending. (*See* Doc. 120, PSR ¶¶ 34, 38, 46, 47.) Further, the conduct giving rise to the § 922(g)(1) conviction in this case occurred in the context of a domestic dispute between neighbors where Petitioner was in possession of a handgun and removed it from his waistband during a physical fight on the porch of the house where the participants resided. Therefore, as in *Walters*, the totality of Petitioner's criminal history , "cut[s] against his as-applied challenge [and] . . . it is hardly plain that it is unconstitutional to disarm, even permanently, a person convicted of non-violent drug trafficking offenses [and first-degree robbery]. *Walters*, 151 F.4th at 135.

District courts within the Third Circuit have concluded that prior drug trafficking and robbery convictions defeat an as-applied challenge to § 922(g)(1). For example, in *United States v. Coates*, No. 1:23-CR-0192, 2025 WL 2178416, at *8 (M.D. Pa. July 31, 2025) (Wilson, J.), the Court assessed the dangerousness of prior convictions for felony drug trafficking and robbery.

> [T]he court concludes that Coates's prior convictions for felony drug trafficking and robbery demonstrate that Coates presents a danger of misusing firearms

and would likely pose an increased risk of physical danger to others if permitted to be armed. *See* [*United States v. White*, No. 23-2013, 2025 WL 384112 at *2 (3d Cir. Feb. 4, 2025)] (holding that defendant's prior criminal convictions for possession with intent to distribute controlled substances, aggravated assault, and carrying an unlicensed firearm "shows that he would pose such a danger to others if armed because those activities could lead to violent confrontation"); [*United States v. Williams*, 113 F.4th 637, 663 (3d Cir. 2024)] (holding that a person convicted of a crime is dangerous and can be disarmed if he has committed, among others, "a crime that inherently poses a significant threat of danger, including (but not limited to) drug trafficking and burglary"); [*United States v. Williams*, No. 23-2773, 2025 WL 1341877, at *2 (3d Cir. May 8, 2025)] (holding that prior convictions for possession with intent to distribute cocaine and marijuana and child endangerment constitute a "dramatically different criminal record" than Bryan Range for purposes of Second Amendment analysis); [*United States* v. *Mollett*, No. 3:21-cr-16-21, 2025 WL 564885 at *7 (W.D. Pa. Feb. 20, 2025)] (holding that three prior convictions for drug trafficking less than two years prior to the Section 922(g)(1) offense support the conclusion that defendant presented a special danger of misusing firearms and was subject to disarmament). Defendant's other prior convictions–though not necessarily sufficient individually to establish the requisite degree of dangerousness–when considered in combination with the drug trafficking and robbery convictions, demonstrate Coates's historical involvement in dangerous and recidivist criminal conduct.

*Coates*, 2025 WL 2178416, at *8.

Finally, *United States v Postell*, No. 24-2026, 2026 WL 1383441 (3d Cir. May 18, 2026) (not precedential), confirms that considerations of dangerousness analyzed in *United States v. Rahimi*, 602 U.S. 680 (2024), in the context of § 922(g)(8)(c)(i),[6] also apply in the § 922(g)(1) context where a defendant has multiple dangerous felonies.

[In *Rahimi*,] [t]he Court pointed to two historical analogues. One was surety regimes, in which magistrates "require[d] individuals suspected of future

---

[6] 18 U.S.C. § 922(g)(8) criminalizes firearm possession by those subject to a court order finding that they "represent[ ] a credible threat to the physical safety" of an intimate partner or the children of the defendant or his partner." *Rahimi*, 602 U.S. at 690.

misbehavior to post a bond." *Id.* at 695. The other was "going armed" laws, which prohibited menacing others with firearms. *Id.* at 697. "Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698.

That same historical tradition justifies Postell's disarmament. Postell, through his extensive criminal history, has shown that he poses "a clear threat of physical violence to another" and "a special danger of misus[ing]" firearms. *Id.* Postell was recently convicted of multiple dangerous felonies. Disarming individuals in Postell's circumstances, as the District Court concluded, is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 689 (quoting *Bruen*, 597 U.S. at 24).

*Postell*, 2026 WL 1383441, at *2.

Here, as noted above, Petitioner has been convicted of multiple dangerous felonies and the offense conduct in this case included threatening conduct with a firearm. Therefore, as applied to Petitioner, § 922(g)(1) is constitutional because of dangerousness as well as his state parole status at the time he committed the § 922(g)(1) offense.

## C. Armed Career Criminal Designation

With his third claimed basis for relief, Petitioner asserts that he was erroneously sentenced pursuant to the Armed Career Criminal Act ("ACCA") because his Pennsylvania state law conviction was wrongly considered a predicate offense which resulted in Petitioner being sentenced above the statutory maximum.  (Doc. 136 at 7; Doc. 151 at 8.)  Petitioner also requests an evidentiary hearing on this claim.  (Doc. 181 at 10.) The Government responds that the issue is waived.  The Court agrees. The Court also concludes that an evidentiary hearing is not warranted.

Petitioner specifically claims that his 2011 Pennsylvania conviction for Possession of a Controlled Substance with Intent to Deliver cannot be used as a predicate offense for ACCA purposes because the state offense of conviction is broader than federal law. (Doc. 151 at 9.) He further asserts that "it is quite clear the Pennsylvania definition of cocaine was broader than the Federal definition at the time Green was accused in January of 2018." (*Id.* at 10.)

The conviction at issue is based on Petitioner's July 20, 2011, arrest for Possession of a Controlled Substance with Intent to Deliver. (*See* Doc. 120, PSR ¶ 46.) Petitioner was sentenced on July 19, 2012, to 27 to 60 months of imprisonment followed by 2 years probation. (*Id.*) Records indicate that he was paroled on January 27, 2016, and on September 14, 2021, probation was "revoked (absconding), and reinstated." (*Id.*) The PSR provides the following details about the arrest:

> On July 20, 2011, Lackawanna County District Attorney's Office detectives in Scranton, Pennsylvania, conducted a search warrant of a residence known for drug distribution. Upon entry at 1115 Monroe Avenue, Dunmore, Pennsylvania, detectives located Daisha Burgess, Lance Green, Richard Garcia, Matthew Williams, Christopher Estreia, Ronald Sledge, Tyrone Duboise, and Jerome Tucker. Lance Green was found hiding in the bathroom and in possession of 30 baggies of cocaine base (crack) and $36.

(*Id.*)

The September 29, 2021, Addendum to the Presentence Report (Doc. 119) indicates that Mr. O'Brien objected to the 2011 Pennsylvania controlled substance conviction being

31

used as a predicate offense for purposes of USSG § 4B1.4. (Doc. 119 at 2.) The

Addendum concluded that the conviction was properly considered:

> The subject was convicted of "serious drug offenses" in paragraphs 38, 46, and 47. With respect to the convictions in paragraphs 38 and 46, the maximum imprisonment penalties are 20 years. . . . These convictions satisfy the definitions of "serious drug offense" as defined at 18 U.S.C. 924(e)(2)(A). The defendant's convictions were all committed on different occasions. Therefore, the defendant has been properly found to be an armed career criminal.

(Doc. 119 at 2.) At sentencing the Court overruled all objections. (Doc. 134, Sentencing

Transcript at 10:5-11:23.)

Petitioner acknowledges that he did not raise this issue on direct appeal. (See Doc.

136 at 7.) As set out above, *see supra* pp. 15-16, a claim not raised on direct appeal cannot

ordinarily be reviewed under § 2255 unless the petitioner can first demonstrate either

"cause" and "actual 'prejudice," resulting from the procedural default or that he is "actually

innocent." See, e.g., *Bousley,* 523 U.S. at 621. It is the defendant's burden to show cause

and prejudice or actual innocence in order to proceed with his claims. *Id.* Petitioner did not

address cause, prejudice, or actual innocence. Therefore, Petitioner has waived the claim

regarding the use of his 2011 state court drug conviction as a predicate ACCA offense.

The Court notes that Petitioner would be unable to make the requisite showing had

he attempted to do so because the state statute of conviction qualifies as a predicate ACCA

offense in the circumstances presented here. In *United States v. Abbott*, 748 F.3d 154 (3d

Cir. 2014), the Third Circuit Court of Appeals held that Pennsylvania statute at issue, 35 Pa.

Stat. § 780-113(a)(30), is divisible and, therefore, the "modified categorical approach" was

32

to be employed to determine whether the conviction at issue was a proper ACCA predicate.

*Id.* at 158.   *Abbott* also explained that the modified categorical approach allows "the court

[to] look beyond the face of the statute to the 'charging document, written plea agreement,

transcript of plea colloquy, and any explicit factual finding by the trial judge to which the

defendant assented' to determine which of the alternative elements was involved in the

defendant's conviction."   *Id.* (quoting *Shepard v. United States,* 544 U.S. 13, 16 (2005)).

*Abbott* concluded that

> [t]he District Court properly employed the modified categorical approach to conclude Abbott's previous conviction for possession with intent to distribute cocaine is an ACCA predicate offense. After the court determined that the modified categorical approach was proper, it looked to the charging document to determine which alternative element had been proved. This was proper under *Shepard v. United States,* 544 U.S. 13, 26, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005).   The charging document—the Bill of Information—specified that the drug at issue was crack cocaine.
>
> A previous conviction is an ACCA predicate if it is "a violent felony or a serious drug offense."   18 U.S.C. § 924(e)(1). Under the ACCA, a "serious drug offense" is defined as:
>
>> an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law[.]
>
> 18 U.S.C. § 924(e)(2)(A)(ii). Under Pennsylvania law, possession with the intent to distribute cocaine is punishable by a maximum term of imprisonment of ten years. 35 Pa. Stat. Ann.. § 780–113(f)(1.1). Accordingly, Abbott's previous conviction under 35 Pa. Stat. Ann.. § 780–113(a)(30) for possession with intent to distribute cocaine is a "serious drug offense" and properly served

as a predicate offense for the imposition of the fifteen-year minimum sentence under the ACCA.

748 F.3d at 159-60.

*Abbott* is dispositive in this case because the August 23, 2011, Information for the July 20, 2011, arrest shows that the crime charged in Count 1 of the Information is 35 Pa. Stat. § 780-113(a)(30), the same as that considered in *Abbott*. (Lackawanna County Court of Common Pleas August 23, 2011, Information at 1.) The Information also indicates that the controlled substance at issue is thirty bags of cocaine base. (*Id.*) Pursuant to the ACCA, this conviction qualities as a serious drug offense and, therefore, was a proper ACCA predicate offence for Petitioner's designation as an armed career criminal.

## D. Evidentiary Hearing

As noted above, Petitioner requests an evidentiary hearing on his ACCA claim. (Doc. 151 at 10.) The Court concludes that an evidentiary hearing is not warranted in this case.

Section 2255 directs that, in some instances, the court "shall" hold an evidentiary hearing.

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of facts and conclusions of law with respect thereto.

28 U.S.C. § 2255(b). In *United States v. Booth*, 432 F.3d 542 (3d Cir. 2005), the Court of Appeals for the Third Circuit explained the court's discretion in these matters:

34

Although a district court has discretion whether to order a hearing when a defendant brings a motion to vacate sentence pursuant to 28 U.S.C. § 2255, our caselaw has imposed limitations on the exercise of that discretion. In considering a motion to vacate a defendant's sentence, "the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record." *Government of the Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989). *See also* R. Governing § 2255 Cases R. 4(b). The District court is required to hold an evidentiary hearing "unless the motion and files and records of the case show conclusively that the movant is not entitled to relief." *Id.* We have characterized this standard as creating a "reasonably low threshold for habeas petitioners to meet." *McCoy*, 410 F.3d at 134 (quoting *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001)). Thus, the district court abuses its discretion if it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief. *Id.* at 131, 134 ("If [the] petition allege[s] any facts warranting relief under § 2255 that are not clearly resolved by the record, the District Court [is] obligated to follow the statutory mandate to hold an evidentiary hearing.").

432 F.3d 545-46.

A hearing is not warranted because the Court's analysis of Petitioner's claims supports a determination that "the motion and files and records of the case show conclusively that the movant is not entitled to relief." *Booth*, 432 F.3d at 545. In this case, Petitioner's "allegations were contradicted conclusively by the record" and many of his "allegations were patently frivolous." *Solis v. United States*, 252 F.3d 289, 295 (3d Cir. 2001).

## V. CONCLUSION

For the foregoing reasons, Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate,

Set Aside, or Correct Sentence (Doc. 136) will be denied.  The Court finds no basis for the

issuance of a certificate of appealability.  A separate Order will follow.

Robert D. Mariani
United States District Judge

36